UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANNETTE KULICK,

Plaintiff,

-v.-

GORDON PROPERTY GROUP, LLC and MARK BORTECK,

Defendants.

23 Civ. 9928 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Annette Kulick ("Plaintiff") brought this action against Gordon Property Group, LLC ("GPG") and Mark Borteck (together with GPG, "Defendants"), claiming gender-based discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *codified as amended*, 42 U.S.C. §§ 2000e to 2000e-17; the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290-301; and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-134. After a discovery period prolonged by Plaintiff's noncompliance, the Court now considers (i) Defendants' motion under Federal Rule of Civil Procedure 56 for summary judgment on all remaining claims and (ii) Defendants' motion under Federal Rule of Civil Procedure 37 for attorneys' fees pursuant to a previously issued discovery sanction. For the reasons set forth in the remainder of this Opinion, the Court grants in part and denies in part Defendants' motion for summary judgment and grants in part their motion for attorneys' fees.

## BACKGROUND[1]

### A. Factual Background

#### 1. The Relevant Parties

##### a. Gordon Property Group, LLC

GPG is a family-owned real estate development and management company based in New York City. (Def. 56.1 ¶ 1). GPG is affiliated with several

---

1 The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendants' motion for summary judgment. The Court primarily sources facts from Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1" (Dkt. #82-16)); Plaintiff's Local Rule 56.1 Response to Defendants' Rule 56.1 Statement and Counterstatement of Material Facts ("Pl. 56.1" (Dkt. #90)); and Defendants' Response to Plaintiff's Counterstatement of Material Facts ("Def. Resp. 56.1" (Dkt. #98)). Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Where a fact stated in a party's Rule 56.1 Statement is supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Where a party agrees to a fact set forth in the opposing party's Rule 56.1 Statement in its entirety, the Court cites only to the original statement.

On the motion for summary judgment, the Court draws additional facts from the Affirmation of Ruth A. Rauls in Support of Defendants' Motion for Summary Judgment ("Rauls MSJ Aff." (Dkt. #83)) and the exhibits attached thereto; the Supplemental Declaration of Ross Hirsch in Support of Defendants' Motion for Summary Judgment ("Hirsch Supp. Decl." (Dkt. #99)); and the Affirmation of Mark A. Nehme in Support of Defendants' Motion for Summary Judgment ("Nehme Aff." (Dkt. #100)).

On the motion for attorneys' fees, the Court sources facts from the Affirmation of Ruth A. Rauls in Support of Defendants' Motion for Attorneys' Fees ("Rauls Fees Aff." (Dkt. #87)) and the exhibits attached thereto, including the transcript of the July 18, 2025 post-fact discovery pretrial conference ("Post-Fact Tr." (Ex. A)), the Court orders entered in connection with Plaintiff's discovery obligations (Ex. D, G, K), and the billing records supporting Defendants' fee request (Ex. O); the Declaration of Annette Kulick in Opposition to Defendants' Motion for Attorneys' Fees ("Kulick Decl." (Dkt. #96)); and the Supplemental Affirmation of Ruth A. Rauls in Support of Defendants' Reply on the Motion for Attorneys' Fees ("Rauls Supp. Fees Aff." (Dkt. #102)) and the exhibit attached thereto (Ex. A).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion for summary judgment as "Def. MSJ Br." (Dkt. #81); to Plaintiff's memorandum of law in opposition to Defendants' motion for summary judgment as "Pl.

other companies, including Gordon Haskett Capital Corporation ("GHCC") and Gordon Haskett Research Advisors. (*Id.* ¶ 2). While GPG is distinct in its business operations from its affiliates, the companies share office space and certain infrastructure. (*Id.* ¶ 3). The parties agree that GPG was Plaintiff's employer for purposes of this case. (Pl. 56.1 ¶ 120).

**b. Mark Borteck**

Mr. Borteck served as general counsel for GHCC and its affiliates, including GPG, from 1978 until his retirement in January 2024. (Def. 56.1 ¶ 4). Over the course of his tenure, Mr. Borteck held the titles of General Counsel, Chief Compliance Officer, and Executive Vice President for various Gordon entities. (Pl. 56.1 ¶ 121). As legal counsel, Mr. Borteck was responsible for all legal and compliance matters pertaining to GPG, including maintaining and enforcing the company's equal employment opportunity and sexual harassment policy. (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 145).

**c. Annette Kulick**

Plaintiff was hired by GPG in May 2019 as an Executive Legal Assistant to Mr. Borteck. (Pl. 56.1 ¶ 120). Throughout her tenure, Plaintiff worked "almost exclusively" for Mr. Borteck, who assigned and oversaw her daily duties. (*Id.* ¶ 122). In this role, Plaintiff was responsible for drafting and

MSJ Opp." (Dkt. #89); to Defendants' reply memorandum of law in support of summary judgment as "Def. MSJ Reply" (Dkt. #97); to Defendants' memorandum of law in support of their motion for attorneys' fees as "Def. Fees Br." (Dkt. #86); to Plaintiff's memorandum of law in opposition to Defendants' motion for attorneys' fees as "Pl. Fees Opp." (Dkt. #95); and to Defendants' reply memorandum of law in support of attorneys' fees as "Def. Fees Reply" (Dkt. #101).

revising documents at Mr. Borteck's direction, and acted as a liaison between Mr. Borteck and various commercial and residential tenants. (Def. 56.1 ¶ 11). Prior to September 2020, Mr. Borteck did not oversee any other attorneys or assistants in the legal department. (*Id.* ¶ 6).

**d. Ross Hirsch**

In or about September 2020, GPG hired Ross Hirsch to join its legal department in anticipation of Mr. Borteck's eventual retirement and in the context of an increased workload during the COVID-19 pandemic. (Def. 56.1 ¶ 14). Mr. Hirsch received the title of General Counsel, and Mr. Borteck became Senior Counsel. (*Id.*). Mr. Borteck remained Plaintiff's direct supervisor for her day-to-day work. (*See* Def. 56.1 ¶ 11; Pl. 56.1 ¶ 122).[2]

**2. GPG's Anti-Harassment Policies and Complaint Procedures**

At all times relevant to this action, GPG maintained a written equal employment opportunity and sexual harassment policy prohibiting harassment in the workplace. (Def. 56.1 ¶ 18). The policy required all employees, including Mr. Borteck, to complete the company's annual anti-sexual-harassment training, and failure to complete such training was considered a violation of company policy. (Pl. 56.1 ¶¶ 143-144). Mr. Borteck was the person responsible for enforcing the training policy. (*Id.* ¶ 145). He was directly involved in the selection, screening, and enforcement of the training materials, and Plaintiff was responsible for assisting Mr. Borteck, and later Mr. Hirsch,

[2] Mr. Hirsch was previously a Defendant in this action, but the Court dismissed all claims against him in its Opinion and Order of February 7, 2025, resolving Defendants' motion to dismiss. (Dkt. #44 ("MTD Op.")).

with coordinating and monitoring employees' completion of the annual program. (Def. 56.1 ¶¶ 12, 20-21).

GPG did not, however, maintain a formal Human Resources department, and no GPG employee held an official human resources title. (Pl. 56.1 ¶ 123). Instead, Deborah Friedman was identified by Mr. Borteck as the company's "de facto" human resources contact (*id.* ¶ 124), a characterization that Ms. Friedman herself described as a "joke" among employees (*id.* ¶ 125), inasmuch as she was "never given that title" and "never considered for that role" (Def. Resp. 56.1 ¶ 125).[3]

The parties dispute what GPG's reporting policy directed employees to do in 2021, and in particular whether an employee with a complaint about Mr. Borteck could avail herself of a reporting channel that did not run through him. (Pl. 56.1 ¶ 126; Def. Resp. 56.1 ¶ 126). GPG maintained a standalone sexual harassment policy during Plaintiff's employment (Def. Resp. 56.1 ¶ 127) and did not implement a full employee handbook until 2023, after her departure (Pl. 56.1 ¶ 127).

The parties also dispute whether Mr. Borteck completed the annual training that he was responsible for administering. (Pl. 56.1 ¶¶ 146-150; Def. Resp. 56.1 ¶¶ 146-150). Plaintiff cites GPG training records reflecting Mr. Borteck's non-completion in 2019 and 2020 and completion of only a preview version in 2021. (Pl. 56.1 ¶¶ 146-149). Defendants respond that Plaintiff

---

3 In their motion papers, Defendants attempt to clarify Mr. Borteck's characterization as a reference to Ms. Friedman's handling of limited tasks, such as payroll and personnel files. (Def. Resp. 56.1 ¶ 124).

herself certified full employee participation in 2019 and 2020, that she acknowledged his 2021 completion at her deposition, and that a certificate confirms it. (Def. Resp. 56.1 ¶¶ 146-149).

As pertinent here, Plaintiff testified that Mr. Borteck told her he refused to take the harassment training because he wanted to "remain a perv." (Pl. 56.1 ¶ 151). Mr. Borteck denies making the statement. (Def. Resp. 56.1 ¶ 151). Plaintiff further cites a November 24, 2020 email in which Mr. Borteck wrote to colleagues regarding the state-mandated training, "I was inclined to skip, but this dissuades me," linking to an article about employer penalties. (Pl. 56.1 ¶ 152). Defendants respond that Mr. Borteck was referring to the yearly subscription renewal for the training service rather than to the training itself. (Def. Resp. 56.1 ¶ 152). Mr. Borteck testified that he felt he already knew what constituted appropriate conduct in the workplace. (Pl. 56.1 ¶ 153).

### 3. The COVID-19 Pandemic and the Parties' Deteriorating Working Relationship

In March 2020, with the COVID-19 pandemic escalating, GPG shut down its office in compliance with New York's state mandate for non-essential businesses, and all company employees were temporarily transitioned to remote work. (Def. 56.1 ¶¶ 26-28). With pandemic-related construction delays, lease terminations, and supply chain disruptions for vendors, the pandemic increased the legal department's workload, and Mr. Borteck, who had not previously worked remotely, found the arrangement difficult. (*See id.* ¶¶ 28-31). Due to the document-intensive nature of his workload, Mr. Borteck returned to the office to work, alone, in April 2020. (*Id.* ¶ 32). During this

period when Mr. Borteck worked in-person during the shutdown, Plaintiff worked remotely from her home. (*Id.* ¶ 34). When New York lifted its statewide shutdown for non-essential businesses on June 22, 2020, GPG allowed individual supervisors to determine appropriate schedules to allow in-office work in some capacity. (*Id.* ¶¶ 35-36). On July 15, 2020, Mr. Borteck required Plaintiff to return to in-office work on a hybrid schedule, citing the legal department's unique need for in-office assistance and support. (*Id.* ¶ 37).

Plaintiff's return to in-office work marked a significant strain on the working relationship. (Def. 56.1 ¶¶ 38-43). Plaintiff grew unhappy with Mr. Borteck's habit of leaving work on her desk prior to her morning arrival and came to believe that he was micromanaging her responsibilities. (*Id.* ¶ 38). She observed that Mr. Borteck was anxious and attributed it to his increased workload and stress from COVID-19, but nevertheless found his behavior to be overbearing as he emphasized time pressures and reduced the timeframe within which her tasks needed to completed. (*Id.* ¶¶ 38-39, 41). What is more, Plaintiff felt as though her workload had been expanded to include in-office work typically completed by other employees who were allowed to remain remote during this period. (*Id.* ¶ 40).

In the fall of 2020, Plaintiff and Mr. Borteck informally agreed that she would work in-office four days a week and remotely each Friday. (Def. 56.1 ¶ 44). Plaintiff understood that Mr. Borteck did not "want to be alone" in the office, but remained resistant to in-office work, characterizing herself as the "schmuck" for being assigned to Mr. Borteck. (*Id.* ¶¶ 44-45). By December

2020, Plaintiff expressed her frustration with Mr. Borteck via text to her then-boyfriend (later husband) and to her work friend, Ildiko Korpai. (*Id.* ¶ 46). Plaintiff testified that Mr. Borteck was a "bully" who used a "mocking derogatory tone." (Pl. 56.1 ¶ 132; Def. 56.1 ¶ 46). This frustration was compounded by Plaintiff's perception that less qualified colleagues were being promoted within GPG. (Def. 56.1 ¶ 47).

On January 19, 2021, Plaintiff wrote to ask for a raise, highlighting the additional in-office duties she covered on behalf of remote employees. (Def. 56.1 ¶ 48). On January 20, 2021, Mr. Borteck met with Plaintiff to explain the company's financial position: GPG declined to issue annual raises in January 2021, citing pandemic-related economic constraints. (*Id.* ¶¶ 48-49). During that meeting, Mr. Borteck provided negative feedback regarding what he perceived as Plaintiff's "careless" work, which feedback Plaintiff contends was not merited. (*Id.* ¶ 50). Following the January 20 meeting, the working relationship did not improve. Plaintiff told Mr. Borteck to stop "provid[ing] negative comments" on her work product, responded to his written feedback with sarcasm, and requested that he not copy others on correspondence pointing out errors in her work. (*Id.* ¶¶ 52-53 (alteration in original)).

Plaintiff alleges more broadly that Mr. Borteck spoke to her in a "derogatory and highly negative manner" throughout her employment, causing her emotional distress. (Pl. 56.1 ¶ 131). Defendants deny the characterization, maintaining that Plaintiff's primary sources of frustration were Mr. Borteck's insistence on in-office work during and following the pandemic and what she

perceived as his anxious and overbearing supervisory style, and that her actual complaint was that Mr. Borteck was not as "nice" or "friendly" to her as he was to other female employees. (Def. Resp. 56.1 ¶ 131).

#### 4. Mr. Borteck's Alleged Gender-Based Conduct During Plaintiff's Employment

In the midst of such workplace friction, which Defendants characterize as wholly gender-neutral, Plaintiff points to a series of incidents and practices that she contends reflect a work environment permeated with gender-based hostility. (Pl. MSJ Opp. 11-13).

##### a. The June 2019 Comment by Michael Haskett

In June 2019, less than one month into Plaintiff's employment at GPG, Michael Haskett, Chairman of the Gordon Haskett affiliate, told Plaintiff in or near Mr. Borteck's office that the wedding ring he gave his wife was "what you get for big tits." (Pl. 56.1 ¶ 128). The parties dispute the setting: Plaintiff asserts the remark was made during a meeting in Mr. Borteck's office, while Defendants contend it was an off-the-cuff comment made in the hallway outside his office. (*Id.*; Def. Resp. 56.1 ¶ 128). The parties do not dispute that Mr. Borteck was present, that he heard the comment, and that he believed it was inappropriate. (Pl. 56.1 ¶ 129).

What Mr. Borteck did in response is disputed. Plaintiff asserts that when she complained to him, his only response was to state dismissively, "That's Michael." (Pl. 56.1 ¶ 130). Defendants deny this, citing Mr. Borteck's testimony that he admonished Mr. Haskett by saying, "You know, [y]ou can't do that. What's wrong with you?" and noting that there is no allegation of

repeated conduct or contact between Plaintiff and Mr. Haskett. (Def. Resp. 56.1 ¶¶ 129-130).

#### b. Mr. Borteck's Alleged Insulting Comments to and About Plaintiff

Plaintiff also accuses Mr. Borteck of making insulting comments to and about her during her employment. During the transition period in which GPG began to reopen its offices, Mr. Borteck recounts seeing Plaintiff in frayed jeans and a sweatshirt. (Def. Resp. 56.1 ¶ 133). Mr. Borteck admitted telling Plaintiff, "Oh, Annette, I see you're wearing your schmattes today," and confirmed that "schmattes" is a Yiddish word for "rags." (Pl. 56.1 ¶¶ 133-134).[4] In response, Plaintiff asked Mr. Borteck whether he minded that she wore such an outfit to work. (Def. Resp. 56.1 ¶ 133). Mr. Borteck responded that he did not because no one else was in the office besides the two of them. (*Id.*).

The parties debate the comment's effect on Plaintiff. Plaintiff testified that she was "very upset" by the comment (Pl. 56.1 ¶ 135), and Ms. Korpai testified that she saw Plaintiff "visibly upset" immediately after an interaction in which Mr. Borteck had used a "Yiddish, a Jewish word" (*id.* ¶ 136). Defendants deny both propositions: Mr. Borteck testified that Plaintiff understood the remark as a casual joke and laughed, and Ms. Korpai's testimony demonstrated that this was the only occasion she recalled Plaintiff distressed after an interaction with Mr. Borteck. (Def. Resp. 56.1 ¶¶ 135-136).

---

[4] The record reflects various spellings of this word. (*E.g.*, Def. 56.1 ¶ 57 ("schmatta"); Pl. 56.1 ¶ 133 ("schmattes")). The Court mirrors the record's inconsistencies and in the remainder of this Opinion adopts the version employed in the relevant record citation.

Plaintiff further alleges that Mr. Borteck called her a "Dachshund." (Pl. 56.1 ¶ 137). Mr. Borteck contemporaneously and categorically denied the accusation (Def. Resp. 56.1 ¶ 137), and explained that Plaintiff had misheard his pronunciation of the phrase "at hand" (Def. 56.1 ¶ 53).

Separately, Plaintiff complains about Mr. Borteck's differing treatment of her and other female colleagues. Mr. Borteck admitted greeting two other female colleagues, Stephanie Ferrara and Tiffany McDonough, with terms such as "sweetie" or "honey," while never greeting Plaintiff in such a manner. (Def. 56.1 ¶ 88; Pl. 56.1 ¶ 140). He attributed the distinction to his approximately twenty-year working relationships with those employees. (Def. 56.1 ¶ 88; Def. Resp. 56.1 ¶ 140). Mr. Borteck testified that Plaintiff complained to him about such greetings. (Pl. 56.1 ¶ 141).

#### c. The Bathroom Incident

Plaintiff alleges that Mr. Borteck spoke to her about a work matter through the door while she was in the bathroom. (Pl. 56.1 ¶ 138). Defendants respond that the incident occurred once, as Plaintiff was in the process of entering the restroom, that the door then faced the common pantry area, and that the subject was a work assignment. (Def. 56.1 ¶ 76; Def. Resp. 56.1 ¶ 138).

#### d. Sexually Explicit Material in Mr. Borteck's Work Email Account

A key factual dispute in this case concerns the sexually explicit content in Mr. Borteck's work email account and, more importantly, the extent of

Plaintiff's exposure to it. It is not genuinely disputed that Mr. Borteck utilized his work email account to receive and respond to sexually explicit communications from websites such as "Flirtymature," "NaughtyDate," "MyCasualContacts," and "xxxpersonals.com," despite Mr. Borteck's testimony that keeping such emails in an employee inbox violated a "cardinal principle" of GPG's office policy. (Pl. 56.1 ¶¶ 154, 156). A number of these emails reference user profiles created with variations of Mr. Borteck's name, such as "mborts85" and "mbortf21." (*Id.* ¶ 156).

The parties dispute whether Mr. Borteck created the accounts. Plaintiff cites deposition testimony suggesting that Mr. Borteck "could not rule out the possibility" (Pl. 56.1 ¶ 157), but Defendants say this is a mischaracterization (Def. Resp. 56.1 ¶ 158). In any event, Mr. Borteck admitted that he used his work computer to click on links in "salacious" emails "three, four, or a half-dozen times," which led to websites containing "nudes" (Pl. 56.1 ¶ 162), and that he responded to a "handful" of explicit emails with a "quip" as a form of "comic relief" (*id.* ¶ 163). He further admitted that in a February 2021 email to friends sent from his work account, he wrote, "I love my golf, but still prefer Tit-lst to Titleist!" — a message Mr. Borteck characterized during his deposition as a crude joke referring to a part of a woman's body, and which he admitted he "should not have done." (*Id.* ¶¶ 167-168).

The crux of the parties' dispute concerns the frequency with which Plaintiff was required or asked to search Mr. Borteck's inbox and, by extension, the degree of her exposure to inappropriate content contained therein. Plaintiff

testified that beginning in or about June 2019, Mr. Borteck "regularly" required her to search his work email account for various documents he claimed he could not locate on his own, and that in doing so she was exposed to "[h]undreds" of sexually explicit emails, including images of "women always nude or semi-nude looking for adventure and love and passion," on a daily basis. (Pl. 56.1 ¶¶ 169-172). Mr. Borteck admitted that when an email from a "scantily clothed" woman appeared, he jokingly told Plaintiff, "Oh, that's one of my Russian girlfriends." (*Id.* ¶ 173). Plaintiff testified that she told Mr. Borteck the emails gave her anxiety and that he "really shouldn't have that on [his] office emails"; Mr. Borteck confirmed that she said so, and that he replied, "You're right," but took no action to remove the emails. (*Id.* ¶¶ 174-175).

Defendants' account differs dramatically. In Mr. Borteck's telling, he asked Plaintiff to look for a work-related document on his computer on one single occasion, during which she inadvertently viewed emails that she later described to Mr. Hirsch as involving "Russian and Chinese sex dolls." (Def. 56.1 ¶¶ 63, 69). Defendants also point to contemporaneous notes that Mr. Hirsch took during this interview with Plaintiff, where she described only "one single occasion" (*id.* ¶ 63); they emphasize that Plaintiff was unable at her deposition to recount any specific email she saw "because [she] really didn't pay attention to that" (*id.* ¶ 69); and they assert that Plaintiff never mentioned the emails in her frequent, contemporaneous text messages to her then-boyfriend, daughters, friends, and Ms. Korpai about Mr. Borteck and her job (*see* Def. MSJ Reply 3).

**5. Plaintiff's April 2021 Complaint and GPG's Response**

On April 1, 2021, Plaintiff complained to Ms. Friedman about Mr. Borteck's behavior (the "April 2021 Complaint"). (Def. 56.1 ¶ 54). At Ms. Friedman's suggestion to "write it down," Plaintiff followed their conversation with an email to Ms. Friedman accusing Mr. Borteck of: (i) speaking to Plaintiff in a "derogative and highly negative manner for the past [two] years causing [her] emotional distress"; (ii) refusing to take the annual sexual harassment training course and stating that "he wanted to stay a pervert"; (iii) calling Plaintiff a "schmatta" and a "dachshund"; (iv) speaking to Plaintiff through the door while she was in the bathroom; and (v) sending Plaintiff emails noting how poor her work was. (*Id.* ¶ 57).

Ms. Friedman reported this complaint to Mr. Hirsch (Def. 56.1 ¶ 58), as well as to company owner Tim Gordon, who responded that he found the allegations "very hard to believe" because he had known Mr. Borteck for many years (Pl. 56.1 ¶ 179). Mr. Hirsch commenced an investigation, interviewing Ms. Friedman, Mr. Borteck, Plaintiff, and three other witnesses. (Def. 56.1 ¶ 60; Pl. 56.1 ¶ 180). While the investigation was pending, Mr. Hirsch instructed Plaintiff to align her remote work days with his own so that Mr. Hirsch would be present whenever she was physically in the office. (Def. 56.1 ¶ 59).

During the investigation, Mr. Borteck showed Mr. Hirsch "solicitous emails" in his inbox, and Mr. Hirsch personally observed an email containing an image of a woman in a state of undress. (Pl. 56.1 ¶¶ 182-183). Mr. Borteck

assured Mr. Hirsch that he did not open or respond to the emails. (*Id.* ¶ 184). During this investigation, GPG did not retain a forensic firm to examine Mr. Borteck's computer. (*Id.* ¶ 186). Mr. Hirsch has since acknowledged that documents produced in the course of litigation revealed that Mr. Borteck had in fact responded to such emails at least once. (*Id.* ¶ 185; *see* Def. Resp. 56.1 ¶ 186).

Mr. Hirsch communicated to Plaintiff that the company had found no "discriminatory or actionable conduct." (Pl. 56.1 ¶ 187). He instructed Mr. Borteck (i) to close the door between his office and Plaintiff's cubicle area; (ii) to be more sensitive in administering criticism; and (iii) not to permit Plaintiff to view his computer going forward. (Def. 56.1 ¶ 75). Plaintiff requested a transfer away from Mr. Borteck, but Mr. Hirsch informed her that no other positions were available and instead offered two months of "transition pay" if she wished to leave, which Plaintiff declined after countering with a request for six months. (Pl. 56.1 ¶¶ 189-190; Def. 56.1 ¶ 73).

On April 22, 2021, Plaintiff sent an email to Ms. Friedman, thanking her for helping process the aforementioned complaint and stating: "Mark has modified his behavior for the better and I'm looking forward to working with Mark in his new professional manner." (Def. 56.1 ¶ 77; Rauls MSJ Aff., Ex. 40). It is undisputed that, following the investigation, Plaintiff reported and recalled no further instances of Mr. Borteck calling her names, commenting on her appearance, or of her seeing emails on Mr. Borteck's computer that she

believed were inappropriate — with the exception of a single work-related incident in November 2021 discussed in the next section. (Def. 56.1 ¶ 78).

**6. GPG's Return-to-Office Policy and Plaintiff's November 2021 Complaint**

On June 18, 2021, GPG issued a memorandum confirming that all company employees should return to in-office work on a full-time basis starting July 6, 2021. (Def. 56.1 ¶ 79). Plaintiff emailed Mr. Borteck in August 2021, remarking that "[t]he times are a changing and we need to be able to change with them." (*Id.* ¶ 80). Mr. Borteck responded by reiterating that her presence in the office was required, given the particular needs of her position in the legal department: "[T]here is the full expectation that you will be in the office every day, net of vacation and personal days," subject to consideration of specific, as-needed requests for remote work. (*Id.*). Plaintiff acknowledged at her deposition that she understood these expectations. (*Id.* ¶ 81).

On November 4, 2021, Plaintiff sent an email to Mr. Borteck, copying Mr. Hirsch, alleging that she had been treated in a humiliating manner (the "November 2021 Complaint"). (Def. 56.1 ¶ 82). Plaintiff wrote that, as she was speaking on her personal cell phone with an employee of the New York State Department of Corporations, "Mark took the phone away from me to 'handle' the discussion himself." (*Id.* ¶ 83). Her email continued:

> Mark continuously feels the need to overpower, micromanage, and stop any sort of communication while intimidating, embarrassing and continuing to denigrate my position. Further, he calls Stephanie F. his little butterfly, Tiffany a sweetheart but I am a schmatta. What is wrong here? Is it not obvious?

(*Id.*).

Defendants deny that Mr. Borteck grabbed Plaintiff's phone, and they counter that Plaintiff was berating a government employee on a work call and that Mr. Borteck intervened. (Def. Resp. 56.1 ¶ 201). Mr. Hirsch investigated the complaint the same day, meeting with both Plaintiff and Mr. Borteck. (Def. 56.1 ¶ 84). During her interview, Plaintiff accused Mr. Borteck of treating her differently than the other women in the office and of treating her as the "acceptor of his anxiety"; she also confirmed that Mr. Borteck had not called her "schmatta" or any other names since early 2021. (*Id.* ¶¶ 85-86). On November 11, 2021, Mr. Hirsch emailed Plaintiff his determination that Mr. Borteck had not acted inappropriately. (*Id.* ¶ 89). No remedial action was taken. (Pl. 56.1 ¶ 201).

**7. The Mortgage Letters, the November 30, 2021 Meeting, and the End of Plaintiff's Employment at GPG**

Around October 2021, Plaintiff began the process of purchasing a home in Honesdale, Pennsylvania, over 100 miles from New York City. (Pl. 56.1 ¶ 191; Def. 56.1 ¶ 92; Def. MSJ Br. 2). The parties dispute the nature of her plans. Defendants cite Plaintiff's testimony that she was acquiring the house for "weekend, vacation, and summer use," intending to keep an apartment in the Bronx with her daughter and possibly commute from Pennsylvania. (Def. 56.1 ¶ 92). Plaintiff maintains that she finalized her plans to relocate to Pennsylvania in reliance on GPG's written statement to her mortgage lender that "[h]er moving to Pennsylvania should not affect her employment." (Pl. 56.1 ¶ 93, 198).

In early October 2021, Jordan Curnow of Summit Mortgage, Plaintiff's lender, asked GPG to confirm that Plaintiff "currently works remotely & that she will continue to work remotely." (Pl. 56.1 ¶ 192; Def. Resp. 56.1 ¶ 193). With the explicit consent of Mr. Borteck and Mr. Hirsch, Ms. Friedman replied that "Annette works remotely sometimes and will continue to work in that way." (Pl. 56.1 ¶ 193). Defendants add that Plaintiff was regularly working in person at this time, and that Mr. Borteck afforded her deference and latitude to work remotely on an as-needed basis. (Def. Resp. 56.1 ¶ 194). On October 25, 2021, Mr. Curnow requested "more clarity" on how frequently Plaintiff would work remotely on an "ongoing basis." (Pl. 56.1 ¶ 194).

In response, on October 27, 2021, Mr. Borteck signed two letters. The first letter confirmed that Plaintiff "worked remotely during the COVID 19 Pandemic, coming into the office when required," and omitted any reference to future remote work. (Pl. 56.1 ¶ 197; Def. Resp. 56.1 ¶¶ 196-199). But Mr. Curnow rejected this language and advised that Summit Mortgage would need language stating that Plaintiff's move "will not affect her employment." (Def. Resp. 56.1 ¶ 197). In internal communications to Mr. Borteck, Mr. Hirsch suggested softening this language by replacing "will not" with "should not." (*Id.*). Mr. Borteck then signed a second letter that stated: "Annette Kulick has been coming into the office as required. *Her moving to Pennsylvania should not affect her employment*." (Pl. 56.1 ¶ 198 (emphasis added)).

On November 30, 2021, shortly after filing the November 2021 Complaint, Plaintiff met with Mr. Hirsch regarding her impending move to

Pennsylvania. (Pl. 56.1 ¶ 202). Defendants describe the meeting as Plaintiff's announcement of her voluntary resignation, at which she informed Mr. Hirsch that she would be permanently relocating to Pennsylvania in December and thus resigning. (Def. 56.1 ¶¶ 94-96; Def. Resp. 56.1 ¶ 203). Plaintiff describes the same meeting as the delivery of an ultimatum: that GPG, reversing the assurances it had provided in writing just a few weeks earlier, told her she must return to the office or lose her job. (Pl. 56.1 ¶¶ 203-204).

Mr. Hirsch's contemporaneous notes of this meeting state:

> Moving to PA on December 18, 19, 20. Planned to keep apartment in BX with daughter, and be there part time. Daughter lost job, so will probably give up apt. Can't afford it solo. Either have to work remotely or leave employment. Don't want to leave us in lurch. Could stay until we have replacement.

(Def. Resp. 56.1 ¶ 204). The same day, Mr. Hirsch emailed Mr. Borteck that Plaintiff "informed me on Monday that she will likely be leaving her job in approximately three weeks because she is relocating permanently to Pennsylvania with her husband and understands that full-time remote work here is not feasible." (Def. 56.1 ¶ 103; Def. Resp. 56.1 ¶ 204).

Defendants deny that GPG ever provided any assurance, written or otherwise, that Plaintiff could work fully remotely moving forward, and assert that Plaintiff never requested one because she understood her position required in-office work. (Def. Resp. 56.1 ¶ 205). Defendants further contend that on November 30, 2021, Plaintiff did not ask whether she could work remotely from Pennsylvania on a permanent basis, but instead offered to do so on a

temporary, transitional basis while GPG searched for her replacement — an offer GPG accepted and honored through January 14, 2022. (*Id.*).

On December 3, 2021, Mr. Hirsch emailed Plaintiff establishing January 14, 2022, as her "official last day of employment." (Pl. 56.1 ¶ 205). Defendants characterize the email as memorializing Plaintiff's voluntary resignation and note that January 14 was a mutually agreed-upon date. (Def. Resp. 56.1 ¶ 206). Plaintiff responded the same day: "Thank you for the update. I am available to stay on to help with the transition through January 14. If needed, I can also work remotely past that date if no one has been hired." (Rauls MSJ Aff., Ex. 52).

December 16, 2021, was Plaintiff's last day in the office. That evening, at 7:52 p.m., Plaintiff sent Mr. Borteck an email thanking him for the "thoughtful and generous gift," and gave holiday cards to Mr. Borteck and Mr. Hirsch. (Rauls MSJ Aff., Ex. 54). Plaintiff and Mr. Borteck exchanged cordial correspondence in the weeks that followed. (Def. 56.1 ¶¶ 106, 111).

On December 20, 2021, Plaintiff sent Mr. Borteck an email with the "Green Acres" theme song as a humorous ode to her move to the countryside, to which Mr. Borteck responded, "You sound happy, which makes me happy for you." (Def. 56.1 ¶ 106).[5] On or around the same day, Plaintiff testified that Mr. Borteck told her that he would have permitted Plaintiff to continue working

---

5 The Court notes a minor discrepancy between the relevant dates. Defendants' Rule 56.1 Statement places the "Green Acres" exchange on December 16, 2021, described as Plaintiff's last in-office day. (*See* Def. 56.1 ¶ 106). The email itself, however, is dated December 20, 2021. (*See* Rauls MSJ Aff. ¶ 57 & Ex. 55). The discrepancy is immaterial to the Court's analysis.

remotely "if you hadn't reported the incident." (Pl. 56.1 ¶ 206 (citing Rauls MSJ Aff., Ex. 1 at 183-85)). Mr. Borteck denies making any such statement. (Def. Resp. 56.1 ¶ 207 (citing Rauls MSJ Aff., Ex. 3 at 94)).

From December 17, 2021, through January 14, 2022, Plaintiff worked remotely from Pennsylvania in a transitional capacity. (Pl. 56.1 ¶ 211). Around that same period, GPG responded to the surge in the COVID-19 Omicron variant and temporarily shifted its workforce from fully in-person to substantially remote work. (*Id.* ¶¶ 207-208). On January 12, 2022, GPG instructed employees to "please come into the office once a week" for the following two weeks, and on January 24, 2022, it announced that employees would "continue working remotely until February 14th." (*Id.*). GPG reverted back to its four-day-in-office policy on February 14, 2022 (Def. Resp. 56.1 ¶ 208), and Plaintiff's replacement — who accepted GPG's employment offer on December 23, 2021 (Def. 56.1 ¶ 107) — was hired with an express in-office requirement and has worked in the office four days per week in accordance with company policy (Hirsch Supp. Decl. ¶¶ 3-4).

On January 3, 2022, citing the continuing COVID resurgence, Plaintiff emailed Mr. Hirsch and Mr. Borteck and offered to continue working remotely beyond January 14 because a replacement might not be able to start immediately. (Def. 56.1 ¶ 108; Pl. 56.1 ¶ 210). Mr. Hirsch declined her offer, informing Plaintiff that a replacement had been found, and Plaintiff responded, "Sounds good. Thank you." (*Id.* ¶¶ 109-110).

On January 4, 2022, Plaintiff emailed Mr. Hirsch requesting a formal "termination letter." (Pl. 56.1 ¶ 213). Mr. Hirsch responded the next day, "[t]he requested letter is attached," enclosing a letter confirming that "your final day of employment at the Gordon Property Group, LLC will be January 14, 2022." (*Id.* ¶ 214). In the same exchange, Mr. Hirsch asked Plaintiff why she wanted the letter, and Plaintiff responded, "NY requires it. Thought it would be good to have." (Def. Resp. 56.1 ¶ 215). Defendants contend that the reference is to New York Labor Law § 195(6), which requires such notice for any separated employee regardless of whether the employee resigned or was discharged. (*Id.* ¶¶ 214-215).

On January 14, 2022, her final day, Plaintiff sent Mr. Borteck a goodbye email stating that she "truly enjoyed" working with him, inviting him to visit her at her new home in Pennsylvania. (Def. 56.1 ¶ 111). On the same day, Mr. Borteck forwarded her farewell email to Mr. Hirsch with the commentary: "All is well that ends well (?)! Thank you so much again for your fine role in advancing the inevitable." (Pl. 56.1 ¶ 215). Mr. Borteck testified that "the inevitable" referred to the completion of Plaintiff's transition period and the hiring of her replacement. (Def. Resp. 56.1 ¶ 216; *see also* Rauls MSJ Aff., Ex. 3 at 110 (Mr. Borteck testifying that his email referred to the "arrangement that since she was moving to Honesdale and knew that it was a full-time job in New York, that she resigned")).

#### 8. Post-Employment Events

On or about January 19, 2022, the New York State Department of Labor ("NYSDOL") sent a notice to GPG regarding Plaintiff's claim for unemployment benefits. (Pl. 56.1 ¶ 216). The notice explicitly stated: "The Department of Labor has received information that shows your former employee ANNETTE KULICK was discharged from his/her job with you." (*Id.* ¶ 217). On January 25, 2022, GPG received notice that Plaintiff had filed for unemployment benefits. (Def. 56.1 ¶ 113). GPG did not contest the claim, nor did it inform the NYSDOL that its position was that Plaintiff had resigned. (Pl. 56.1 ¶¶ 218-219). GPG did not communicate with anyone at NYSDOL until an agent reached out months later with questions. (*Id.* ¶ 116). Plaintiff's application was delayed, but ultimately approved. (Def. 56.1 ¶¶ 117-118).

### B. Procedural Background

#### 1. Administrative Proceedings

On or about March 13, 2022, Plaintiff filed a complaint with the New York State Division of Human Rights (the "NYSDHR"), which complaint was cross-filed with the Equal Employment Opportunity Commission (the "EEOC"). (Dkt. #23 ("Amended Complaint" or "AC") ¶ 6; *see also* Def. 56.1 ¶ 119). On or about September 5, 2023, the NYSDHR dismissed Plaintiff's complaint on the grounds of "administrative convenience." (AC ¶ 6). On or about October 18, 2023, the EEOC issued Plaintiff a Notice of Right to Sue, and Plaintiff commenced this action within 90 days of her receipt of that notice. (*Id.*; *see* Dkt. #1).

### 2. Plaintiff's Initial Pleadings and the Motion to Dismiss

Plaintiff filed her original complaint on November 9, 2023. (Dkt. #1). Within ten days of filing, Plaintiff provided notice of the complaint to the New York City Commission on Human Rights and the Office of the Corporation Counsel, as required to assert claims under the NYCHRL. (AC ¶ 7). N.Y.C. Admin. Code § 8-502(c). After amending her complaint (AC), the parties proceeded to motion practice (Dkt. #29-31, 34-35), and on February 7, 2025, the Court issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss (MTD Op.).

As relevant here, the Court dismissed Count I (Title VII gender discrimination) in its entirety; Count IV (NYSHRL gender discrimination) and Count V (NYSHRL hostile work environment) as against Mr. Borteck in his individual capacity, because the NYSHRL imposes direct liability for discrimination on "employers" only, *see* N.Y. Exec. Law § 296(1)(a); and all claims against then-Defendant Mr. Hirsch. The Court sustained the remaining nine counts: Title VII hostile work environment and retaliation claims against GPG (Counts II and III); NYSHRL gender discrimination and hostile work environment claims against GPG (Counts IV and V); an NYSHRL retaliation claim against GPG and Mr. Borteck (Count VI); NYCHRL gender discrimination, hostile work environment, and retaliation claims against GPG and Mr. Borteck (Counts VII through IX); and an NYSHRL and NYCHRL aiding-and-abetting claim against Mr. Borteck (Count X). Defendants filed their Answer to the Amended Complaint on February 21, 2025. (Dkt. #48).

### 3. Discovery Disputes

Discovery was protracted and messy, requiring multiple Court orders to ensure Plaintiff's compliance with her discovery obligations. (*See* Dkt. #43, 55, 59, 63, 70; Post-Fact Tr.). Specifically, Plaintiff repeatedly failed to produce the full universe of documents in her possession that were responsive to Defendants' requests under the parties' stipulated Electronically Stored Information ("ESI") Protocol. (Rauls Fees Aff. ¶¶ 4-21; Dkt. #24 ("ESI Protocol")).

As a result, the Court sanctioned Plaintiff and awarded two forms of relief. (Post-Fact Tr. 20-23). *First*, the Court ordered Plaintiff to sit for a second deposition and to pay for the associated costs. (*Id.* at 21). *Second*, because Defendants had to repeatedly seek Court intervention in "prying these documents out of the plaintiff's hands," the Court "impose[d] some portion of the costs that the defense incurred in bringing to [its] attention these deficiencies in discovery and in getting these documents ultimately produced." (*Id.*). The Court characterized this second form of relief as "a very, very mild sanction" and "just some portion of the costs that have been incurred by the defense in getting these things." (*Id.* at 22).

The Court hoped that the parties would agree on the amount of fees and costs Plaintiff owed Defendants without further Court intervention. (Post-Fact Tr. 23). Unfortunately, the parties could not reach agreement on their own, so the Court set a briefing schedule on the issue of attorneys' fees (Dkt. #78), and the parties filed submissions (Dkt. #85-87, 95-96, 101-102).

#### 4. Summary Judgment Briefing

Concurrently, the parties proceeded to summary judgment briefing. On September 26, 2025, Defendants filed their motion for summary judgment as to all remaining counts, along with a supporting memorandum of law, the Declaration of Ross Hirsch with accompanying exhibits, the Affirmation of Ruth A. Rauls with accompanying exhibits, and their Local Rule 56.1 Statement. (Dkt. #80-83). On October 31, 2025, Plaintiff filed her memorandum of law in opposition, her Response to Defendants' Rule 56.1 Statement and Counterstatement of Material Facts, and the Declaration of Alex Rissmiller with accompanying exhibits. (Dkt. #89-92). On November 21, 2025, Defendants filed their reply memorandum, their Response to Plaintiff's Counterstatement, the Supplemental Declaration of Ross Hirsch, and the Affirmation of Mark A. Nehme. (Dkt. #97-100).

## DISCUSSION

### A. The Court Grants in Part and Denies in Part Defendants' Motion for Summary Judgment

The Court begins with Defendants' motion for summary judgment. It orders its analysis by addressing in turn Plaintiff's claims of gender discrimination, hostile work environment, and then retaliation. After concluding this analysis, the Court turns to Defendants' motion for attorneys' fees.

#### 1. Applicable Law

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations, quotation marks, and emphasis omitted). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

**2. Analysis**

**a. The Relevant Statutory Frameworks**

As mentioned, Plaintiff brings her claims under Title VII, the NYSHRL, and the NYCHRL. Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Similarly, the NYSHRL makes it "an unlawful discriminatory practice ... [f]or an employer ... because of an individual's ... gender identity or expression ... [or] sex ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). Finally, the NYCHRL makes it unlawful for "an employer or an employee or agent thereof, because of the actual or perceived ... gender ... of any person," to discriminate "in ... terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a).

As this Court explained in resolving Defendants' motion to dismiss, the New York Legislature amended the NYSHRL on August 19, 2019. (MTD Op. 20-21 (citing *Syeed* v. *Bloomberg, L.P.*, 568 F. Supp. 3d 314, 343 (S.D.N.Y. 2021), *vacated and remanded on other grounds*, No. 22-1251, 2024 WL 2813563 (2d Cir. June 3, 2024) (summary order)). In amending the NYSHRL, the Legislature provided that the statute "shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably ..., have been so construed." N.Y. Exec. Law § 300. The amendment thus had the effect of "render[ing] the standard for [NYSHRL] claims closer to the standard of the NYCHRL." *Livingston* v. *City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021). (*See* MTD Op. 21).

This Court has previously assumed, for purposes of Defendants' motion to dismiss in this action, that the post-amendment NYSHRL aligns with the NYCHRL. (MTD Op. 22-23). *Accord Wright* v. *City of New York*, No. 23 Civ. 3149 (KPF), 2024 WL 3952722, at *6 (S.D.N.Y. Aug. 27, 2024). Because the amended NYSHRL standard is at a minimum "closer to" the NYCHRL standard, *Wellner* v. *Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019), the Court adopts the same assumption here. *See also Valerio* v. *Metro. Transportation Auth.*, No. 24-1614, 2025 WL 686028, at *3 (2d Cir. Mar. 4, 2025) (summary order) (analyzing NYSHRL and NYCHRL claims together because the NYSHRL "was amended in 2019 to align with the NYCHRL's more liberal pleading standard" (quoting *Qorrolli* v. *Metro. Dental Assocs.*, 124 F.4th 115, 122-23 (2d Cir. 2024)); *Wright* v. *White Plains Hosp. Med. Ctr.*, 232 N.Y.S.3d 594, 596 (2d Dep't 2025) ("As a result of the amendment, the NYSHRL now aligns with the standards of the [NYCHRL]"). Therefore, the Court analyzes Plaintiff's NYSHRL and NYCHRL claims under the same standard throughout this Opinion, except where otherwise explicitly noted.

And although the post-amendment NYSHRL standard "only appl[ies] to claims that accrue on or after the effective date of October 11, 2019," *Wellner*, 2019 WL 4081898, at *5 n.4, the standard applies to most of the conduct at issue in this case because "a cause of action for discrimination under the NYSHRL accrues … on the date of the alleged discriminatory act," *Fair Hous. Just. Ctr., Inc.* v. *JDS Dev. LLC*, 443 F. Supp. 3d 494, 504 (S.D.N.Y. 2020)

(internal quotation marks omitted and alteration adopted). Plaintiff alleges that most of the discriminatory acts occurred after October 11, 2019. (MTD Op. 21). *Supra* Background A.

#### b. The Court Grants Summary Judgment for GPG on the NYSHRL Gender-Discrimination Claim (Count IV), but Allows the NYCHRL Gender-Discrimination Claim Against Both GPG and Mr. Borteck (Count VII) to Go Forward

The Court previously dismissed Plaintiff's Title VII gender discrimination claim (Count I) for failure to allege a causal nexus between an adverse employment action and gender. (MTD Op. 15-19). The Court sustained, however, Plaintiff's parallel discrimination claims under the NYSHRL (Count IV) and the NYCHRL (Count VII), finding that Plaintiff had adequately alleged that she was "treated less well at least in part because of [her] gender." (*Id.* at 23-27 (quoting *Delo* v. *Paul Taylor Dance Found., Inc.*, 685 F. Supp. 3d 173, 183 (S.D.N.Y. 2023))). Now, on summary judgment, the Court determines that only the NYCHRL claim (Count VII) may proceed to trial.

To state a viable discrimination claim under the NYCHRL and the post-amendment NYSHRL, a plaintiff need not allege that she suffered a materially adverse employment action or that "discriminatory animus was the but-for cause or even the primary motivation of [her] alleged mistreatment." *Delo*, 685 F. Supp. 3d at 183; *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114 (2d Cir. 2013) ("[T]he NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct."). Rather, Plaintiff must show only that she was "treated less well at least in part because of [her] gender." *Delo*, 685 F. Supp. 3d at 183 (internal quotation marks

omitted) (quoting *Mihalik*, 715 F.3d at 110). In other words, "to state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive." *Nezaj* v. *PS450 Bar and Rest.*, 719 F. Supp. 3d 318, 330 (S.D.N.Y. 2024) (alterations adopted) (quoting *Gorokhovsky* v. *N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order)). And that treatment must be "more than trivial, insubstantial, or petty." *Torre* v. *Charter Commc'ns, Inc.*, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020) (quoting *Gorman* v. *Covidien, LLC*, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015)).

The NYCHRL (and for purposes of this Opinion, the NYSHRL) is to be construed "broadly in favor of discrimination plaintiffs, to the extent that such construction is reasonably possible." *Delo*, 685 F. Supp. 3d at 183 (quoting *Mihalik*, 715 F.3d at 109). "Unlike Title VII, the NYCHRL thus does not require a connection between the discriminatory conduct and a materially adverse employment action." *Nezaj*, 719 F. Supp. 3d at 330-31 (internal quotation marks and citation omitted). And it is the defendant who bears the burden of proving that his conduct amounted to no more than "what a reasonable victim of discrimination would consider 'petty slights or trivial inconveniences.'" *Mihalik*, 715 F.3d at 111 (quoting *Williams* v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009)). As such, a defendant is entitled to summary judgment on an NYSHRL or NYCHRL discrimination claim only if "the record establishes as a matter of law that 'discrimination play[ed] *no* role' in [his]

actions." *Id.* at 110 n.8 (first alteration in original) (quoting *Williams*, 872 N.Y.S.2d at 38, 40 n.27).

Courts may analyze NYSHRL and NYCHRL discrimination claims under either the *McDonnell Douglas* burden-shifting framework or the mixed-motive framework (or some combination of the two), and a plaintiff defeats summary judgment by satisfying either. *Forrester* v. *Corizon Health, Inc.*, 278 F. Supp. 3d 618, 626 (E.D.N.Y. 2017) (collecting cases). Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination; if the plaintiff does so, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action; and the burden then shifts back to the plaintiff to show that the proffered reason is pretextual. *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-04 (1973); *Forrester*, 278 F. Supp. 3d at 626. For discrimination claims, "once the employer has made a showing of a neutral reason for the complained of action, to defeat summary judgment the employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." *Karupaiyan* v. *CVS Health Corporation*, No. 19 Civ. 8814 (KPF), 2023 WL 5713714, at *18 (S.D.N.Y. Sept. 5, 2023) (alterations adopted) (quoting *Terry* v. *Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

The mixed-motive framework follows the first two steps of *McDonnell Douglas* — first asking whether the plaintiff "has established a *prima facie*

case" and second whether the defendant has presented "admissible evidence of legitimate, independent, and nondiscriminatory reasons to support its employment decision" — and "diverge[s]" only at the third. *Hamburg* v. *N.Y. Univ. Sch. of Med.*, 62 N.Y.S.3d 26, 32 (1st Dep't 2017) (internal quotation marks and citation omitted). Where *McDonnell Douglas* asks the plaintiff at step three to prove that the legitimate reasons proffered by the defendants were merely a pretext for discrimination, the mixed-motive framework asks the plaintiff only to come "forward with evidence from which it could be found that 'unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for [the] adverse employment decision.'" *Id.* (alteration in original) (quoting *Melman* v. *Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 40 (1st Dep't. 2012)).

Put differently, a defendant is entitled to summary judgment on a mixed-motive theory only if "the plaintiff has failed to adduce direct or circumstantial evidence 'from which it could rationally be inferred that discrimination was a motivating factor, even in part, for the defendant's treatment'" of her. *Forrester*, 278 F. Supp. 3d at 626-27 (alterations adopted) (quoting *Melman*, 946 N.Y.S.2d at 41); *see also Karupaiyan*, 2023 WL 5713714, at *18 ("[A] plaintiff may allege a mixed-motive claim, in which he must only show that [the employer's proffered reasons] were not the only reasons and that [the] plaintiff's protected status contributed to the employer's decision." (final alteration in original) (internal quotation marks and citation omitted)). Because the mixed-motive framework's third step is more lenient, this framework "imposes a lesser

burden on a plaintiff" than *McDonnell Douglas*. *White Plains Hosp. Med. Ctr.*, 232 N.Y.S.3d at 596.

Notably, GPG and Mr. Borteck face different theories of liability on these claims. Mr. Borteck, against whom only the NYCHRL gender discrimination claim remains, can be directly liable for his own discriminatory conduct. (MTD Op. 28 (citing *Nezaj*, 719 F. Supp. 3d at 330)). But GPG, against whom claims for gender discrimination under both the NYSHRL and the NYCHRL remain, can be liable only under a theory of vicarious liability. Under the NYSHRL, GPG is vicariously liable if it "became a party to [Mr. Borteck's discriminatory conduct] by encouraging, condoning, or approving it." *Brown* v. *City of New York*, No. 11 Civ. 2915 (PAE), 2013 WL 3789091, at *18 (S.D.N.Y. July 19, 2013) (internal quotation marks and citation omitted); *see also Murtha* v. *N.Y. State Gaming Commission*, No. 17 Civ. 10040 (NSR), 2019 WL 4450687, at *17 (S.D.N.Y. Sept. 17, 2019); *Doe* v. *Bloomberg, L.P.*, 36 N.Y.3d 450, 455 (2021). Under the NYCHRL, by contrast, GPG is vicariously liable if (i) "[t]he employee or agent exercised managerial or supervisory responsibility," (ii) "[t]he employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action," or (iii) "[t]he employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct." N.Y.C. Admin. Code § 8-107(13)(b); *see also Zakrzewska* v. *New Sch.*, 14 N.Y.3d 469, 479 (2010); *Brown*, 2013 WL

3789091, at *18 ("The NYCHRL imposes liability on the employer in three instances.").

Applying these principles — and resolving all ambiguities and drawing all reasonable inferences in Plaintiff's favor, *see Vt. Teddy Bear*, 373 F.3d at 244 — the Court concludes that a reasonable jury could find that Mr. Borteck treated Plaintiff less well, at least in part, because she is a woman, and further that Mr. Borteck was Plaintiff's manager or supervisor within the meaning of the NYCHRL. However, no reasonable jury could find that GPG encouraged, condoned, or approved Mr. Borteck's differential treatment of Plaintiff. Thus, the Court allows Count VII (NYCHRL gender discrimination) to go forward against both GPG and Mr. Borteck, and it grants summary judgment on Count IV (NYSHRL gender discrimination) in favor of GPG.

#### i. Under the Mixed-Motive Framework, Plaintiff's Claim of NYCHRL Gender Discrimination Against Mr. Borteck Survives

Plaintiff has adduced evidence from which a jury could find gender-based discrimination that, at least in part, motivated Mr. Borteck to treat Plaintiff differently, so the Court cannot grant Mr. Borteck summary judgment on Count VII. *See Forrester*, 278 F. Supp. 3d at 626-27. Specifically, applying the mixed-motive framework, the Court finds that Plaintiff has established a *prima facie* case of gender discrimination based on (i) the sexually explicit material in Mr. Borteck's email inbox that she reviewed, (ii) the allegedly insulting, gender-based names Mr. Borteck called her, (iii) Mr. Borteck speaking to her while she was in the bathroom, and (iv) Mr. Borteck's refusal to complete the anti-

harassment training in order to "remain a perv." As explained below, Defendants offer non-discriminatory justifications for these behaviors (and dispute the extent to which they occurred at all), but Plaintiff successfully rebuts these justifications to create a genuine dispute of material fact that gender discrimination at least in part motivated Mr. Borteck's behavior.

Taking the emails first, Plaintiff testified that Mr. Borteck regularly required her to search his work email account for documents he claimed he could not locate, and that in performing this recurring task she was exposed, on a near-daily basis, to hundreds of sexually explicit emails depicting nude and semi-nude women. (Pl. 56.1 ¶¶ 169-172). The record indicates that Mr. Borteck's work inbox received communications from explicit sites; a number of the associated user profiles bore variations of his name; he admitted clicking through to websites containing "nudes" on several occasions and responding to explicit emails with a "quip" as a form of "comic relief"; and he admitted joking to Plaintiff, when a "solicitous" email appeared, that its sender was "one of my Russian girlfriends." (*Id.* ¶¶ 154, 156, 162-163, 173).

A supervisor's exposure of a subordinate to pornographic material, coupled with sexist commentary, can support an NYCHRL claim because such conduct signals that the supervisor "considered it appropriate to foster an office environment that degraded women." *Hernandez* v. *Kaisman*, 957 N.Y.S.2d 53, 59 (1st Dep't 2012) (holding that "comments and emails objectifying women's bodies and exposing them to sexual ridicule, even if considered 'isolated,' clearly signaled" such discriminatory views); *see also*

*Mihalik*, 715 F.3d at 113. A rational jury could credit Plaintiff's account and conclude that Mr. Borteck — by requiring his female assistant to sift through an inbox filled with salacious emails and then exacerbating that experience by remarking about his "Russian girlfriends" — treated Plaintiff less well because of her gender.

To be sure, Defendants vigorously dispute the extent to which Plaintiff was exposed to these explicit emails. But Defendants' factual challenge to this evidence only shows that the dispute should go to a jury. In particular, Defendants contend that Plaintiff viewed the explicit emails on a single, inadvertent occasion; that she described the encounter to Mr. Hirsch during the April 2021 investigation as isolated; that she was unable at her deposition to identify a single specific email "because [she] really didn't pay attention to that"; that she never mentioned the emails in her voluminous contemporaneous messages complaining about Mr. Borteck; and that a forensic analysis that Defendants conducted of Mr. Borteck's mailboxes establishes that images of women appeared in only a small fraction of his emails (by Defendants' calculation, roughly 0.59% of more than 105,000 emails) and were largely clustered within a two-month window in late 2020. (Def. 56.1 ¶¶ 63, 69; Def. Resp. 56.1 ¶ 172; Nehme Aff. ¶¶ 2-13). But the Court finds that whether to credit Plaintiff's "regular" and "daily" account or Defendants' "single incident" account is a genuine dispute of material fact. For now, Plaintiff's sworn statements regarding her exposure to these emails

demonstrates that Mr. Borteck treated her differently at least in part based on her gender.

Turning next to the insulting name-calling, it remains undisputed that Mr. Borteck greeted two female colleagues, Ms. Ferrara and Ms. McDonough, with endearments such as "sweetie" and "honey," while never addressing Plaintiff in such terms. (Def. 56.1 ¶ 88; Pl. 56.1 ¶ 140; *see also* Pl. 56.1 ¶ 83 (Plaintiff asserting that Mr. Borteck "calls [Ms. Ferrara] his little butterfly")). Instead, Mr. Borteck decried Plaintiff's appearance — calling her frayed jeans "schmattes" or rags (Pl. 56.1 ¶¶ 133-134), and referring to her as a "Dachshund" (*id.* ¶ 137). Defendants dispute the significance of the first comment and the very occurrence of the second. They argue that the "schmattes" remark was invited by Plaintiff's own question about her attire and that Plaintiff understood it as a joke and laughed. (Def. MSJ Br. 18; Def. 56.1 ¶ 71; Def. Resp. 56.1 ¶ 133). (*But see* Pl. 56.1 ¶¶ 135-136 (Ms. Korpai testifying that she saw Plaintiff "visibly upset" immediately after an interaction in which Mr. Borteck used "a Yiddish, a Jewish word")). And Defendants argue that the "dachshund" remark never occurred but instead was a mishearing of the phrase "at hand." (Def. 56.1 ¶ 53; Def. Resp. 56.1 ¶ 137). Once again, however, these disputes create questions for the jury to answer, not the Court. And the NYCHRL does not require comparators for gender discrimination claims, so it is enough for Plaintiff to show different terms of address directed at her female co-workers. *See Pizarro* v. *Euros El Tina Rest. Lounge & Billiards Corp.*, No. 20 Civ. 5783 (AKH), 2024 WL 837572, at *1 (S.D.N.Y. Feb. 27, 2024),

*aff'd sub nom. Pizarro* v. *Quezada*, No. 24-2422, 2025 WL 2865251 (2d Cir. Oct. 9, 2025) (summary order); *Hechavarria* v. *Scorch Bar & Grill Inc.*, No. 23 Civ. 1743 (NGG) (VMS), 2025 WL 2476346, at *14 (E.D.N.Y. Aug. 28, 2025). Thus, resolving the ambiguities in the record in Plaintiff's favor, a comparison of the terms of endearment directed at Ms. Ferrara and Ms. McDonough and the invective reserved for Plaintiff supports an inference of differential treatment under the NYCHRL.

That said, the NYCHRL still requires that differential treatment be *because of* Plaintiff's gender. *See Mihalik*, 715 F.3d at 110. This is a harder showing for Plaintiff to make given that "schmatta" and "dachshund" are not obviously gender-based. (*See* Def. MSJ Br. 18 (asserting that both terms are facially gender-neutral)). It is possible to interpret Mr. Borteck's "schmatta" remark as a critical comment on Plaintiff's appearance, which he would not have made but for the fact that Plaintiff is a woman. And, in theory, it is possible to understand the "dachshund" insult as a gendered reference to a female dog. To that end, "gender-based comments can serve as evidence that gender played an impermissible role," particularly where a supervisor singles out a female subordinate for appearance-based remarks he does not direct at her peers. *King* v. *Aramark Servs., Inc.*, 96 F.4th 546, 564 (2d Cir. 2024); *see id.* (holding that a supervisor's "singling out of [a female employee] for weight-related remarks and conduct … that [he] did not direct toward her male peers … reflected … a gender-based bias").

Admittedly, viewing Mr. Borteck's remarks as gender-based may not be the most reasonable interpretation — at least not absent the surrounding context of Mr. Borteck's other behavior. Nor, absent this context, might the remarks rise above the level of petty slights. (*See* Def. MSJ Br. 17-20 (advancing these arguments)). But that is why Plaintiff's NYCHRL gender-discrimination claim against Mr. Borteck does not survive because of these remarks alone; rather, the Court considers them in the broader context of the aforementioned emails and of certain conversations between Plaintiff and Mr. Borteck that are discussed in the two paragraphs that follow, all of which evidence contributes to a larger narrative from which a jury could infer gender-based hostility. *Cf. Mihalik*, 715 F.3d at 114 (advising that while the NYCHRL does "not operate as a general civility code," "even a single comment may be actionable in appropriate circumstances" (internal quotation marks and citation omitted)).

This larger narrative includes Plaintiff's allegation that Mr. Borteck spoke to her about a work matter through the door while she was in the bathroom. (Pl. 56.1 ¶ 138). Defendants contend that the incident was a one-off that occurred while she was in the process of entering the bathroom, and that the interaction was gender-neutral because it was about work. (Def. 56.1 ¶ 76; Def. Resp. 56.1 ¶ 138). In isolation, Defendants' position has appeal. But given the greater context of Mr. Borteck's behavior, a juror could infer from his inability to leave his female employee alone while she used the women's bathroom that he acted with a gender-discriminatory motive.

Finally, a jury could consider Plaintiff's testimony that Mr. Borteck told her he refused to complete the company's anti-harassment training because he wished to "remain a perv." (Pl. 56.1 ¶ 151). Mr. Borteck denies making the statement (Def. Resp. 56.1 ¶ 151), and the parties dispute at length whether and when he completed the training he was responsible for administering (Pl. 56.1 ¶¶ 146-150; Def. Resp. 56.1 ¶¶ 146-150). At summary judgment, though, the Court must credit Plaintiff's testimony that Mr. Borteck made the statement. A jury could reasonably view a supervisor's professed desire to "remain a perv," offered as his reason for evading anti-harassment training, as direct evidence of gender discrimination in the workplace — which also illuminates the motive behind the explicit email exposure, the appearance-based remarks, and the bathroom conversation. Defendants' competing explanations — including their contention that a related email concerned a subscription renewal rather than the training itself (Def. Resp. 56.1 ¶ 152) — present questions of credibility and inference traditionally reserved for trial.

Defendants, resisting the conclusion that these four buckets of evidence support Plaintiff's gender-discrimination claims, maintain that Plaintiff's treatment was not gender-based, even if it was differential. They argue that these interactions were the product of Plaintiff's status as Mr. Borteck's only direct report — which status explains her early return to in-office work and her assumption of office-management tasks left by remote colleagues — and from the non-gendered friction of a strained supervisory relationship — reflected in Mr. Borteck's anxious and overbearing management style, as well as his

criticism of what he perceived as Plaintiff's careless work. (Def. MSJ Br. 20-22; Def. MSJ Reply 2).

Admittedly, Defendants' narrative of a stressful-but-gender-neutral workplace finds some support in the record. Plaintiff herself attributed part of the deterioration in their working relationship to Mr. Borteck's stress, his micromanagement, and his insistence on in-office attendance during the pandemic. (Def. 56.1 ¶¶ 38-46). She aired these complaints repeatedly to friends, family, and Ms. Korpai without any explicit reference to her gender. (*Id.*). Further, Plaintiff was Mr. Borteck's only assistant, the legal department had a particular need for in-office support, and Mr. Borteck provided Plaintiff with critical performance feedback that was facially gender-neutral. (*Id.* ¶¶ 6, 36-37, 49-50). Standing alone, these facts would present a closer question under Title VII. They do not, however, entitle Mr. Borteck to summary judgment under the NYCHRL.

The mere availability of a gender-neutral explanation is not the governing standard and does not entitle Defendants to summary judgment. Here, Defendants prevail only if the record "establishes as a matter of law that 'discrimination play[ed] *no* role' in [their] actions." *Mihalik*, 715 F.3d at 110 n.8 (first alteration in original) (quoting *Williams*, 872 N.Y.S.2d at 38, 40 n.27). For the reasons just discussed, the record permits a rational jury to conclude otherwise. *See id.* at 110 (the NYCHRL is to be construed "broadly in favor of discrimination plaintiffs, to the extent that such construction is reasonably possible" (internal quotation marks and citation omitted)). Thus, because the

record supports the inference that Mr. Borteck was responsible for gender discrimination against Plaintiff, Plaintiff's NYCHRL claim against him (Count VII) survives.

#### ii. GPG Is Not Vicariously Liable for Mr. Borteck's Gender-Discrimination Under the NYSHRL, but It Is Under the NYCHRL

GPG's liability for Mr. Borteck's gender discrimination, however, is more complicated. Under the NYSHRL, GPG is only vicariously liable if it "became a party to [Mr. Borteck's discriminatory conduct] by encouraging, condoning, or approving it." *Brown*, 2013 WL 3789091, at *18 (internal quotation marks and citation omitted). Plaintiff does not have a colorable argument for encouragement or approval. So, focusing on condonation, an employer condones its employee's discriminatory conduct by responding in bad faith to the conduct or not responding at all. *See M.H.* v. *Starbucks Coffee Co.*, No. 22 Civ. 10507 (GHW), 2023 WL 5211023, at *5 (S.D.N.Y. Aug. 13, 2023) (collecting cases); *Swiderski* v. *Urb. Outfitters, Inc.*, No. 14 Civ. 6307 (JPO), 2017 WL 6502221, at *7 (S.D.N.Y. Dec. 18, 2017). Conversely, an employer disproves condonation by showing that it "reasonably investigated complaints of discriminatory conduct and took corrective action." *Vitale* v. *Rosina Food Prods.*, 727 N.Y.S.2d 215, 218 (4th Dep't 2001); *accord Swiderski*, 2017 WL 6502221, at *7.

Here, Mr. Hirsch's investigations in response to Plaintiff's April and November 2021 Complaints suffice to disprove that GPG condoned Mr. Borteck's behavior. Therefore, GPG is not vicariously liable for Mr. Borteck's

gender discrimination under the NYSHRL, and the Court grants it summary judgment on Count IV.

Understandably, Plaintiff takes issue with the adequacy of Mr. Hirsch's investigations. For example, she observes that GPG accepted Mr. Borteck's assurances that he did not open or respond to the explicit emails and accordingly decided not to retain a forensic firm to examine his computer even though Mr. Hirsch saw an explicit email in Mr. Borteck's inbox. (Pl. 56.1 ¶¶ 182-184, 186). GPG's decision was arguably proven unwise by Mr. Hirsch's later acknowledgment that discovery revealed Mr. Borteck had responded to such emails at least once. (*Id.* ¶ 185; *see* Def. Resp. 56.1 ¶ 186). Further, Plaintiff expresses dissatisfaction with Mr. Hirsch's post-April 2021 Complaint remediations, which included instructing Mr. Borteck to close the door between his office and Plaintiff's cubicle and to forbid Plaintiff from viewing his computer going forward. (Pl. MSJ Br. 1, 5, 15-16; Def. 56.1 ¶ 75).

But GPG needed only to mount "a good-faith response to address [Mr. Borteck's] misconduct," because such a response "precludes a conclusion that an employer has condoned misbehavior even if reasonable people could find that response insufficient." *M.H.*, 2023 WL 5211023, at *5. Because GPG reasonably investigated Plaintiff's complaints and took corrective action, it did enough to escape vicarious liability for Mr. Borteck's gender discrimination under the NYSHRL, even if Plaintiff wishes GPG had done more. *See Vitale*, 727 N.Y.S.2d at 218; *Swiderski*, 2017 WL 6502221, at *7.

The NYCHRL, however, presents a different standard and compels a different result. There are three routes to GPG's vicarious liability under the NYCHRL: (i) if Mr. Borteck exercised managerial or supervisory responsibility; (ii) if GPG knew of Mr. Borteck's discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action; or (iii) if GPG should have known of Mr. Borteck's discriminatory conduct and failed to exercise reasonable diligence to prevent it. N.Y.C. Admin. Code § 8-107(13)(b); *Zakrzewska*, 14 N.Y.3d at 479; *Brown*, 2013 WL 3789091, at *18. The immediately preceding analysis forecloses GPG's liability via the second and third routes, leaving only the first: if Mr. Borteck exercised managerial or supervisory responsibility, GPG is strictly liable for his conduct. *See Zakrzewska*, 14 N.Y.3d at 479-81; *Bloomberg, L.P.*, 36 N.Y.3d at 456.

The definition of managerial or supervisory responsibility under Section 8-107(13)(b)(1) is not settled. *See Rivera* v. *United Parcel Service, Inc.*, Index No. 303092/2008, 2015 WL 13345524, at *9 n.6 (Sup. Ct. N.Y. Cnty. Dec. 24, 2015); *O'Neil* v. *Roman Cath. Diocese of Brooklyn*, Index No. 6189/2007, 2011 WL 1587753, at *9 (Sup. Ct. Kings Cnty. 2011), *aff'd*, 949 N.Y.S.2d 447 (2d Dep't 2012); *Cajamarca* v. *Regal Entert. Grp.*, Index No. 103027/2012, 2013 WL 5717119 (Sup. Ct. N.Y. Cnty. Oct. 17, 2013). The NYCHRL does not provide a definition, nor does case law. *Rivera*, 2015 WL 13345524, at *9 n.6; *O'Neil*, 2011 WL 1587753, at *9; *Cajamarca*, 2013 WL 5717119. But while the United States Supreme Court has, for purposes of Title VII, defined supervisor as one who is empowered to "effect a significant change in employment status, such

as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013), New York courts have rejected this definition with respect to the NYCHRL and found that a "broader," "more liberal standard should apply," *Rivera*, 2015 WL 13345524, at *9 n.6 (collecting cases, including *O'Neil* and *Cajamarca*). This Court must therefore apply that broader, more liberal definition: whether the employee "has authority to direct the employee's daily work activities," *Rivera*, 2015 WL 13345524, at *9 n.6; *accord Cajamarca*, 2013 WL 5717119, including by "exercis[ing] the authority to make and oversee the daily work assignments of the plaintiff," *O'Neil*, 2011 WL 1587753, at *9 (internal quotation marks and citation omitted).

Mr. Borteck easily fits this definition. In fact, it is undisputed that he had a managerial or supervisory relationship with Plaintiff, as the NYCHRL defines it. Mr. Borteck "supervised Plaintiff's work" (Pl. 56.1 ¶ 12) and directed her day-to-day activities (*id.* ¶ 11 (Plaintiff's "responsib[ilities] were "pursuant to [Mr.] Borteck's direction"); *id.* ¶ 122 ("[Mr.] Borteck … assigned and oversaw [Plaintiff's] daily duties.")). Thus, under the NYCHRL, GPG is strictly liable for Mr. Borteck's gender discrimination (Count VII). *See Zakrzewska*, 14 N.Y.3d at 479-81; *Bloomberg, L.P.*, 36 N.Y.3d at 456. The Court therefore grants summary judgment to GPG on Count IV but denies it on Count VII.

### c. Plaintiff's Hostile Work Environment Claims Under Title VII and the NYCHRL (Counts II and VIII) Survive, but the NYSHRL Claim (Count V) Does Not

The Court next considers Plaintiff's hostile work environment claims, which currently remain against GPG under Title VII (Count II) and the NYSHRL (Count V), and against GPG and Mr. Borteck under the NYCHRL (Count VIII). The Court begins with the Title VII claim, which is subject to a stricter standard. Then the Court addresses the NYSHRL and NYCHRL claims, largely adopting the gender-discrimination analysis above. *See Karupaiyan*, 2023 WL 5713714, at *25 ("Because the NYCHRL does not differentiate between hostile work environment and discrimination claims, the Court's analysis and conclusions largely track those reached regarding Plaintiff's NYCHRL discrimination claims." (alterations adopted) (internal quotation marks omitted) (quoting *Milord-Francois* v. *N.Y. State Off. of Medicaid Inspector Gen.*, 635 F. Supp. 3d 308, 330 (S.D.N.Y. 2022))).

#### i. A Reasonable Jury Could Find a Hostile Work Environment Under Title VII

To establish a hostile work environment under Title VII, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn* v. *City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting *Harris* v. *Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)). But the employer need not take "'tangible employment action that itself constitutes a change in the terms and conditions of employment' [such as] by formally

altering a worker's employment status." *Gregory* v. *Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (alterations adopted) (quoting *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 753-54 (1998)), *as amended* (Apr. 20, 2001). Rather, a plaintiff must show that the complained-of conduct "[i] is objectively severe or pervasive — that is, ... creates an environment that a reasonable person would find hostile or abusive (the 'objective' requirement)"; [ii] creates an environment "that the plaintiff subjectively perceives as hostile or abusive (the 'subjective' requirement)"; and [iii] "creates such an environment because of the plaintiff's sex ... (the 'prohibited causal factor' requirement)." *Id.* at 691-92 (alterations adopted) (internal quotation marks and citations omitted).

The four buckets of evidence that support Plaintiff's gender-discrimination claims also support her hostile work environment claims — though with greater success against GPG here. The Court has already explained how Mr. Borteck's explicit emails, name-calling, bathroom conversation, and refusal to take the anti-harassment training created an environment that Plaintiff subjectively perceived as hostile and that a jury could infer occurred because she is a woman. That leaves the objective requirement — whether Mr. Borteck's conduct was sufficiently objectively severe or pervasive — an inquiry that "depends on the totality of the circumstances." *Aulicino* v. *N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (internal quotation marks and citation omitted).

To conduct this severe-or-pervasive assessment, courts consider factors such as: "[i] the frequency of the discriminatory conduct; [ii] its severity;

[iii] whether it is physically threatening and humiliating, or a mere offensive utterance; and [iv] whether it unreasonably interferes with an employee's work performance." *Littlejohn*, 795 F.3d at 321 (quoting *Harris*, 510 U.S. at 23). Additionally, courts must not "view individual incidents in isolation," *Redd* v. *N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012), because "[t]he incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," *Perry* v. *Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal quotation marks and citation omitted).

Directly relevant to the explicit emails issue, the Second Circuit has "repeatedly held that the presence of pornography in a workplace can constitute a hostile work environment." *Legg* v. *Ulster Cnty.*, 979 F.3d 101, 117 (2d Cir. 2020). And in *Patane* v. *Clark*, 508 F.3d 106 (2d Cir. 2007), the court held that an employee's being required to handle pornographic material as part of her duties was relevant to assessing whether her work environment was objectively hostile to women, *id.* at 114-15 — circumstances comparable to Plaintiff's testimony that searching Mr. Borteck's inbox was a recurring job assignment. So, crediting Plaintiff's account, a jury could find that being assigned to sift daily through Mr. Borteck's sexually explicit inbox, punctuated by his remarks about his "Russian girlfriends," demonstrates an objectively hostile work environment.

As noted, Defendants vigorously dispute Plaintiff's version of the explicit emails story. But determining the frequency with which Plaintiff was exposed to these emails requires the Court to decide whether to credit her account, and

that is a question committed to the factfinder at trial. *See Vt. Teddy Bear*, 373 F.3d at 244. Although Defendants' forensic analysis of Mr. Borteck's mailboxes is probative, it is also limited: it measures the contents of the mailboxes, not how frequently Plaintiff searched them. This analysis therefore frames a genuine issue of material fact rather than resolves one.

Moreover, Plaintiff's alleged exposure to the emails does not exist independent of the other three buckets of evidence. *Redd*, 678 F.3d at 176. Plaintiff's position is reinforced by a series of incidents that, taken together, could permit a reasonable jury to find an environment affected by gender-based hostility: Mr. Borteck's "schmattes" remark directed at her appearance, his alleged "dachshund" comment, his conversation with her while she used the bathroom, and his professed wish to "remain a perv" as his reason for evading anti-harassment training. (Pl. 56.1 ¶¶ 133-138, 151). Considering the collective body of evidence, the Court therefore concludes that a reasonable jury could find that Plaintiff was subjected to conduct severe or pervasive enough to alter the conditions of her employment, and that she was subjected to it because of her sex, thus constituting a hostile work environment under Title VII.

But Count II only remains against GPG. So the next question is whether GPG is liable for the environment Mr. Borteck fostered. And at this stage and on this record, there exist genuine disputes of material fact that prevent GPG from escaping liability.

Under Title VII, an employer can be vicariously liable for a hostile work environment created by its employee. *Vance*, 570 U.S. at 424. The standards for determining an employer's vicarious liability differ depending on whether the employee is a co-worker or a supervisor (and these terms have distinct meanings that are different from the NYCHRL standard discussed above). *See id.* If the employee is a non-supervisory co-worker, the employer is liable only if it either "'failed to provide a reasonable avenue for complaint' or 'knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Legg*, 979 F.3d at 115 (quoting *Duch* v. *Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)).

If the employee is a supervisor, however, a different set of considerations govern. As pertinent here, an employee qualifies as a supervisor if "he or she is empowered by the employer to take tangible employment actions against the victim" — that is, "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 570 U.S. at 424, 431 (internal quotation marks and citation omitted). And where the supervisor's harassment "culminates in a tangible employment action, the employer is strictly liable." *Id.* at 424. "But if no tangible employment action is taken, the employer may escape liability by establishing ... [the *Faragher-Ellerth*] affirmative defense." *Id.* To successfully invoke this defense, an employer must establish that "[i] the employer exercised reasonable care to prevent and correct any harassing behavior and [ii] that the

plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* (citing *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 807 (1998); *Ellerth*, 524 U.S. at 765). As the employer, GPG bears the burden of establishing both elements of the *Faragher-Ellerth* defense. *Lamarr-Arruz* v. *CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 659 (S.D.N.Y. 2017) (citing *Vance*, 570 U.S. at 443).

While GPG would likely escape liability if Mr. Borteck were merely a non-supervisory co-worker for the same reasons it escapes liability for Mr. Borteck's gender discrimination under the NYSHRL (namely, the adequacy of Mr. Hirsch's investigations), two disputes of material fact prevent the Court from resolving GPG's Title VII liability at this stage, thus requiring Count II to proceed to trial.

*First*, it remains disputed whether Mr. Borteck was a "supervisor" for purposes of GPG's employer liability within the meaning of Title VII.[6] Defendants refute that Mr. Borteck qualifies as a supervisor under *Faragher-Ellerth*'s definition. They contend that Mr. Borteck, "like any other employee at GPG," lacked the authority to unilaterally hire or terminate Plaintiff absent authorization from ownership. (Def. 56.1 ¶ 13). Plaintiff responds that Mr. Borteck's own testimony reflects that he twice stated he was "not sure" whether he possessed that authority. (Pl. Response 56.1 ¶ 13). And neither party disputes that Mr. Borteck assigned and oversaw Plaintiff's daily duties, or that

---

[6] For avoidance of doubt, "supervisor" in this section has a different meaning than elsewhere in this Opinion, *e.g.,* when used colloquially in the Background section and as a term of art with respect to the NYCHRL.

she worked "almost exclusively" for him. (Def. 56.1 ¶ 6; Pl. 56.1 ¶¶ 121-122). Nor, for that matter, does anyone dispute that Mr. Borteck signed the October 27, 2021 letters bearing on whether Plaintiff's relocation would "affect her employment." (Pl. 56.1 ¶¶ 197-198). Weighing this data and drawing all inferences in Plaintiff's favor, a rational jury could find that Mr. Borteck was reasonably empowered to effect a significant change in Plaintiff's employment status and was thus her supervisor for purposes of a *Faragher-Ellerth* analysis. *See Vance*, 570 U.S. at 431.

*Second*, if Mr. Borteck was a supervisor, it remains disputed whether Plaintiff was terminated or resigned and thus whether Mr. Borteck's harassment "culiminate[d] in a tangible employment action." *Vance*, 570 U.S. at 424; *see also Nezaj*, 719 F. Supp. 3d at 336 ("[T]ermination is the archetypal form of adverse action."). For their part, Defendants argue that Plaintiff voluntarily resigned in order to move to Pennsylvania. (Def. MSJ Br. 2, 9-11, 14-17). But Plaintiff avers that she was terminated (Pl. MSJ Br. 8-11), and both positions find support in the record.

To demonstrate why such a dispute exists, the Court starts with Mr. Hirsch's contemporaneous interview notes stating that Plaintiff would "[e]ither have to work remotely or leave employment." (Def. Resp. 56.1 ¶ 204). Defendants say that Mr. Hirsch was quoting Plaintiff and that the notes reflect her "understand[ing]" that because GPG's requirement of "full-time remote work … was not feasible" given her permanent relocation to Pennsylvania, she would "likely be leaving her job in approximately three weeks." (*Id.*).

Defendants offer substantial evidence establishing that a core requirement of Plaintiff's job and a condition of her employment was that she worked in person — and that she understood this expectation. (Def. MSJ Br. 9 ("It was 100% clear that fulltime remote work for Plaintiff was not an option." (citing Def. 56.1 ¶¶ 80-81))). They also point to Plaintiff's cordial correspondence with Mr. Borteck on her final day of employment (*id.* at 10-11 ("I truly enjoyed our projects together and all that [you] shared with me. I would love to see you — please come up to visit the beautiful lakes, waterfalls and a lovely town." (quoting Def. 56.1 ¶ 111)), and Plaintiff's offer to work remotely through a transition period (*id.* at 17 (quoting Def. 56.1 ¶ 102)) as evidence that Plaintiff voluntarily (and amicably) separated from GPG.

But a reasonable jury could interpret this evidence differently. Plaintiff posits that Mr. Hirsch's notes are but his own interpretative gloss on the consequences of Plaintiff's decision to move. (*See* Pl. MSJ Opp. 6 (quoting Pl. 56.1 ¶¶ 196, 198)). And Plaintiff points to the mortgage-related letters and emails as evidence that GPG approved her remote work arrangement — meaning that she did not believe her move to Pennsylvania necessitated her resignation and that GPG used her relocation as grounds to terminate her. (*See id.* at 5-7, 9). As previously described, these letters and emails explained that Plaintiff "works remotely sometimes and will continue to work in that way" (Pl. 56.1 ¶ 193); that "[s]he can continue to [work remotely] on occasion and when needed going forward" (*id.* ¶ 195); that "[h]er moving to Pennsylvania should not affect her employment" (*id.* ¶¶ 196, 198); and that she "worked

remotely during the COVID 19 Pandemic, coming into the office when required" (*id.* ¶ 197). Further buttressing her position, Plaintiff observes that the January 19, 2022 NYSDOL notice recited that she "was discharged," a characterization that GPG never contested (*id.* ¶¶ 217-219), and her testimony that Mr. Borteck told her that he would have permitted her to continue working remotely "if you hadn't reported the incident" (*id.* ¶ 206).

Of course, Defendants refute Plaintiff's interpretations of this evidence. They argue that the mortgage-related letters and emails demonstrate only a kindhearted desire to help an employee purchase a weekend home, not a change in her employment expectations. (Def. Resp. 56.1 ¶ 196). And Mr. Borteck denies saying that he would have permitted Plaintiff to continue working remotely but for her reporting. (*Id.* ¶ 207). All that these counterarguments accomplish, however, is the creation of genuine disputes of material fact.[7]

Thus, the Court cannot conclude from this record (i) whether Mr. Borteck was Plaintiff's supervisor within the meaning of Title VII or (ii) whether Plaintiff resigned or experienced a tangible employment action in the form of

---

[7] The Court is reminded of the aphorism that "no good deed goes unpunished." And that is because some of the most powerful evidence in the record — such as GPG's statements to the mortgage company concerning Plaintiff's continued ability to work remotely and its reticence in the face of references to Plaintiff's termination by the NYSDOL — appears to have been generated specifically for Plaintiff's benefit. In other words, these statements do not appear to have been generated in the ordinary course of business, but rather were prepared at Plaintiff's instigation so that she could obtain a second mortgage and secure unemployment benefits. If these statements were true when made by Defendants, then Plaintiff may have powerful arguments to make at trial. If not, the Court appreciates the irony of Plaintiff using false or misleading statements to obtain benefits from third parties, and then reusing them to bolster her discrimination claims against Defendants.

termination, and for these reasons it must resolve in Plaintiff's favor GPG's eligibility for a *Faragher-Ellerth* defense to Mr. Borteck's creation of a hostile work environment. Plaintiff's Title VII hostile work environment claim against GPG (Count II) thus proceeds to trial.

#### ii. Plaintiff's NYCHRL Claim (Count VIII) Survives, but Her NYSHRL Claim (Count V) Does Not

That Plaintiff's hostile work environment claim against GPG survives under Title VII does not, however, guarantee its survival under the NYSHRL or the NYCHRL. Fortunately, the discussion is somewhat simplified because the analysis of hostile work environment claims under the NYSHRL and the NYCHRL is the same as the analysis of discrimination claims under the NYSHRL and the NYCHRL. *Marseille* v. *Mount Sinai Health Sys., Inc.,* No. 18 Civ. 12136 (VEC), 2021 WL 3475620, at *9 (S.D.N.Y. Aug. 5, 2021), *aff'd sub nom. Marseille* v. *Mount Sinai Hosp.*, No. 21-2140, 2022 WL 14700981 (2d Cir. Oct. 26, 2022) (summary order); *Zagerson* v. *N.Y.C. Dep't of Educ.*, No. 20 Civ. 11055 (KPF), 2022 WL 292917, at *16 (S.D.N.Y. Jan. 31, 2022); *Karupaiyan*, 2023 WL 5713714, at *25. Thus, the Court's earlier conclusion that a jury could find on this record that Mr. Borteck committed gender discrimination in violation of the NYSHRL and the NYCHRL extends to Plaintiff's hostile work environment claims here. In other words, at this stage, the Court finds a triable issue that Mr. Borteck created a hostile work environment under the NYSHRL and the NYCHRL. This means that Plaintiff's remaining hostile work environment claim against Mr. Borteck, which is under the NYCHRL only

(Count VIII), proceeds to trial. But that leaves open the issues of GPG's vicarious liability under the NYSHRL (Count V) and the NYCHRL (Count VIII).

Turning first to the NYSHRL hostile work environment claim, the Court finds that vicarious liability standard is the same as before: whether GPG "became a party to [Mr. Borteck's creation of a hostile work environment] by encouraging, condoning, or approving it." *Brown*, 2013 WL 3789091, at *18. The Court has already explained that GPG did not condone Mr. Borteck's discriminatory conduct — let alone encourage or approve it — and that logic applies with equal force here. Because GPG mounted "a good-faith response to address [Mr. Borteck's] misconduct" through Mr. Hirsch's investigations into Plaintiff's April and November 2021 Complaints, it cannot be said to have condoned Mr. Borteck's misbehavior and thus cannot not be vicariously liable. *M.H.*, 2023 WL 5211023, at *5. Accordingly, the Court grants summary judgment to GPG on Count V.

But as explained above, the NYCHRL's vicarious liability standard is not so favorable to GPG. Under the NYCHRL, GPG is strictly liable for Mr. Borteck's creation of a hostile work environment if he "exercised managerial or supervisory responsibility." N.Y.C. Admin. Code § 8-107(13)(b); *see also Zakrzewska*, 14 N.Y.3d at 479; *Brown*, 2013 WL 3789091, at *18. As a reminder, the definition of managerial or supervisory responsibility here is "broader" and "more liberal" than under Title VII. *Rivera*, 2015 WL 13345524, at *9 n.6 (collecting cases). It is whether the employee "has authority to direct the employee's daily work activities," *id.*; *accord Cajamarca*, 2013 WL 5717119,

including by "exercis[ing] the authority to make and oversee the daily work assignments of the plaintiff," *O'Neil*, 2011 WL 1587753, at *9 (internal quotation marks and citation omitted). The Court has already explained why Mr. Borteck satisfies this definition — even though a genuine dispute of material fact exists as to his satisfaction of the stricter Title VII definition — so GPG is vicariously liable for Mr. Borteck's creation of a hostile work environment under the NYCHRL, and Count VIII survives.[8]

#### d. All of Plaintiff's Retaliation Claims (Counts III, VI, IX) Survive

The Court turns next to Plaintiff's claims that Defendants retaliated against her for complaining of gender discrimination. These claims remain against only GPG under Title VII (Count III) and against both GPG and Mr. Borteck under the NYSHRL (Count VI) and the NYCHRL (Count IX).

Retaliation claims brought under Title VII are analyzed using the *McDonnell Douglas* burden-shifting framework. *Kaytor* v. *Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate "[i] participation in a protected activity; [ii] that the defendant knew of the protected activity; [iii] an adverse employment action; and [iv] a causal connection between the protected activity

---

[8] Although not necessary for this analysis, the Court notes that the *Faragher-Ellerth* defense "is inapplicable in the NYCHRL context," and "[it] is unclear whether [it] applies to NYSHRL claims." *Green* v. *N.Y.C. Transit Auth.*, No. 15 Civ. 8204 (ALC), 2020 WL 5632743, at *10 (S.D.N.Y. Sept. 21, 2020). Thus, with respect to the NYCHRL hostile work environment claim, *Faragher-Ellerth* cannot save Defendants. And with respect to the NYSHRL hostile work environment claim, Defendants do not need a *Faragher-Ellerth* defense because they escape vicarious liability for another reason.

and the adverse employment action." *Hicks* v. *Baines,* 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute* v. *Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). The plaintiff's burden at this first step is "*de minimis,*" *id.*, and requires "a minimal amount of evidence," *Kaytor*, 609 F.3d at 552.

As for the NYSHRL and the NYCHRL, "[r]etaliation victims are provided with broader protection under [both provisions] than their federal counterpart." *See Wright*, 2024 WL 3952722, at *10; *see also Qorrolli*, 124 F.4th at 122-23 (indicating that the post-amendment NYSHRL retaliation standard aligns with the NYCHRL's retaliation standard); *McHenry* v. *Fox News Network, LLC*, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020) ("Retaliation claims under the NYCHRL are subject to a broader standard than under ... Title VII." (citing N.Y.C. Admin. Code. § 8-107(7))). Specifically, the elements of a *prima facie* case of retaliation under the NYCHRL (and the post-amendment NYSHRL) are identical to those under Title VII, "except that the plaintiff need not prove any adverse employment action; instead, [she] must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Leon* v. *Columbia Univ. Med. Ctr.*, No. 11 Civ. 8559 (NSR), 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013) (internal quotation marks and citation omitted); *accord Stinson* v. *Morningstar Credit Ratings, LLC*, No. 22 Civ. 6164 (JLR), 2024 WL 3848515, at *23 (S.D.N.Y. Aug. 16, 2024).

Finally, on the issue of GPG's vicarious liability, the standards should by now be familiar. *First*, as to Title VII, "[t]here are two ways that liability ... can be imputed to an employer." *Sarkis* v. *Ollie's Bargain Outlet*, 560 F. App'x 27,

29 (2d Cir. 2014) (summary order). They are the categories outlined in *Vance*. *Id.* (explaining that plaintiff can show that her harasser was either (i) a supervisor or (ii) a non-supervisory co-worker and that employer knew or reasonably should have known about the harassment but failed to take appropriate remedial action (citing, among others, *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765)). *Second*, as to the NYSHRL, GPG is vicariously liable if it "became a party to [Mr. Borteck's discriminatory conduct] by encouraging, condoning, or approving it." *Brown*, 2013 WL 3789091, at *18. *Third*, as to the NYCHRL, GPG is vicariously liable (i) if Mr. Borteck exercised managerial or supervisory responsibility, (ii) if GPG knew of Mr. Borteck's discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action, or (iii) if GPG should have known of Mr. Borteck's discriminatory conduct and failed to exercise reasonable diligence to prevent it. N.Y.C. Admin. Code § 8-107(13)(b).

Here, the Court concludes that Plaintiff's evidence suffices to make out a retaliation claim under Title VII's more demanding standard, and thus necessarily suffices under the NYSHRL's and the NYCHRL's more permissive standards. *See Farmer* v. *Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 334 (S.D.N.Y. 2020) (holding that sustaining Title VII retaliation claim "dictates the same result under the NYCHRL"). With this conclusion in hand, the Court determines that GPG is vicariously liable under Title VII, the NYSHRL, and the NYCHRL. Accordingly, the Court permits all the retaliation claims (Count III

against only GPG, and Counts VI and IX against both GPG and Mr. Borteck) to go forward.

#### i. On This Record, Plaintiff Has Established Each of Her Retaliation Claims Under Title VII, the NYSHRL, and the NYCHRL

The Court begins by walking through the *McDonnell Douglas* analysis. Defendants do not contest that Plaintiff has met the first two elements of a *prima facie* case of retaliation. As to the first (participation in a protected activity), complaining about harassing conduct "is a paradigmatic instance of protected activity," *Nezaj*, 719 F. Supp. 3d at 335, and Plaintiff's April 2021 Complaint to Ms. Friedman — accusing Mr. Borteck of, among other things, refusing anti-harassment training because he wished to "remain a pervert," and of calling her a "schmatta" — qualifies. (Def. 56.1 ¶ 57). Defendants contend that the November 2021 Complaint was not protected activity because it concerned Mr. Borteck's micromanagement rather than gender (Def. MSJ Br. 31-32; Def. 56.1 ¶¶ 85-86), but the Court finds that at least on this record, the November 2021 Complaint's description of Mr. Borteck calling other employees "sweetie" and "honey," while criticizing Plaintiff as a "schmatta" sufficiently raises a gender issue so as to constitute protected activity (Pl. 56.1 ¶ 83). And regarding the second element (Defendants' knowledge), the record reflects Defendants' knowledge of Plaintiff's protected activity: Ms. Friedman relayed Plaintiff's April 2021 Complaint to company owner Mr. Gordon and to Mr. Hirsch (who later brought the complaint to Mr. Borteck's attention), thus establishing Defendants' knowledge. (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 179).

On the third element of Plaintiff's *prima facie* retaliation case, adverse employment action, the Court has already explained that a genuine dispute of material fact exists as to whether Plaintiff voluntarily resigned or was terminated. So, as explored above, the Court must resolve the ambiguities in Plaintiff's favor and draw the inference that she was terminated.

That brings the Court to the fourth and final step of Plaintiff's *prima facie* retaliation case, a causal connection between her protected activity (the April 2021 and November 2021 Complaints) and the adverse employment action (Plaintiff's termination). Causation may be established either "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or ... directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at 319 (internal quotation marks and citation omitted). Title VII retaliation requires but-for causation, but this standard "does not require proof that retaliation was the only cause of the employer's action." *Zann Kwan* v. *Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Plaintiff offers direct evidence of causation, testifying that in mid-December 2021, Mr. Borteck told her that he would have allowed her to keep working remotely "if you hadn't reported the incident." (Pl. 56.1 ¶ 206). If credited, that statement is direct evidence that Plaintiff's protected activity was a but-for cause of her separation. Mr. Borteck denies making such a

statement (Def. Resp. 56.1 ¶ 207), but that denial raises a credibility question for the jury.

Additionally, Plaintiff has adduced circumstantial evidence of causation. Plaintiff filed her November 2021 Complaint on November 4, 2021, and the events leading to her separation followed within roughly three weeks: the November 30, 2021 meeting, Mr. Hirsch's notes reflecting that Plaintiff would "[e]ither have to work remotely or leave employment," and the December 3, 2021 email from Mr. Hirsch setting January 14, 2022, as Plaintiff's last day. (Def. 56.1 ¶¶ 82, 94-96; Def. Resp. 56.1 ¶ 204). The temporal proximity between Plaintiff's November 2021 Complaint and the initiation of the parties' separation permits a jury to infer a retaliatory connection. *See Littlejohn*, 795 F.3d at 319. Indeed, the Second Circuit has held that a gap of this length suffices to support an inference of causation. *See Zann Kwan*, 737 F.3d at 845 (holding that a three-week period between the protected activity and the adverse action was "sufficiently short to make a prima facie showing of causation indirectly through temporal proximity").

So too the (disputedly) abrupt reversal on GPG's stance regarding Plaintiff's remote work. On Plaintiff's telling — which the Court will accept at this stage — an October 27, 2021 letter represented that Plaintiff's "moving to Pennsylvania should not affect her employment" (Pl. 56.1 ¶ 198), yet mere weeks later, GPG conditioned her continued employment on full-time, in-office attendance. That about-face is another data point from which a jury could infer retaliatory motive, notwithstanding Defendant's counter-narrative that

this language was appropriately noncommittal and, in any event, reflected only a kindhearted desire to help a departing employee.

The Court also bears in mind that Plaintiff need not prove that retaliation was the *sole* cause of her separation; it is enough that the separation would not have occurred but for Defendant's retaliation. *Zann Kwan*, 737 F.3d at 846. Taken together, then, the evidence in the record — the temporal proximity, the about-face regarding remote work, and, most importantly, Mr. Borteck's "if you hadn't reported the incident" statement (Pl. 56.1 ¶ 206) — permits a reasonable jury to find a causal connection between Plaintiff's complaints and her termination. Plaintiff has thus made out a *prima facie* case of retaliation under Title VII, and therefore under the NYSHRL and the NYCHRL too.

Because Plaintiff has established a *prima facie* case, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for the separation. *Zann Kwan*, 737 F.3d at 845. But the Court has already explained why Defendants rebuttal arguments fall short. Defendants argue that Plaintiff was not terminated but rather voluntarily resigned, but the Court must resolve this argument in Plaintiff's favor for now. Defendants argue that Mr. Borteck did not ever utter the "if you hadn't reported the incident" statement, but in a he-said-she-said battle at summary judgment, the Court cannot conclude in favor of either side as a matter of law. Thus, Mr. Borteck must fight his liability for Plaintiff's NYSHRL and NYCHRL retaliation claims (Counts VI and IX) at trial.

#### ii. On This Record, GPG Is Vicariously Liable for All the Retaliation Claims (Counts IIV, VI, and IX)

Having found a triable issue regarding Mr. Borteck's direct liability, the Court now addresses GPG's vicarious liability for his retaliatory conduct. On the Title VII retaliation claim (Count III), the result is familiar: because genuine disputes exist as to whether Mr. Borteck was a supervisor and whether Plaintiff was terminated, this claim survives. The NYSHRL retaliation claim (Count VI), however, also survives. While GPG did not approve, condone, or encourage Mr. Borteck's gender discrimination or creation of a hostile work environment, it is liable for Mr. Borteck's retaliation because it approved her termination, at the very least through Mr. Hirsch's coordination of Plaintiff's departure. *See Brown*, 2013 WL 3789091, at *18. This conclusion, however, rests on the Court's acceptance that Plaintiff was terminated, a factual dispute that Defendants may ultimately disprove at trial. Finally, regarding the NYCHRL retaliation claim, because Mr. Borteck was a manager or supervisor within the meaning of N.Y.C. Admin. Code § 8-107(13)(b)(1), GPG is strictly liable for his conduct. *See Zakrzewska*, 14 N.Y.3d at 479-81; *Bloomberg, L.P.*, 36 N.Y.3d at 456.

### e. The Court Grants Summary Judgment to Defendants on Plaintiff's Aiding and Abetting Claim (Count X)

Plaintiff alleges that Mr. Borteck aided and abetted GPG's violations of the NYSHRL and the NYCHRL (Count X). "Both the NYSHRL and the NYCHRL prohibit 'aid[ing], abet[ting], incit[ing], compel or coerce the doing' of any unlawful acts of discrimination under either title, including sexual harassment

and retaliation." *McHenry*, 510 F. Supp. 3d at 68 (alterations in original) (quoting N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8-107(6)). "The same standard governs aiding and abetting claims under the NYSHRL and NYCHRL 'because the language of the two laws is virtually identical.'" *Id.* (quoting *Feingold* v. *New York*, 366 F.3d 138, 158 (2d Cir. 2004)).

The record establishes that Plaintiff's aiding and abetting theories are predicated on Mr. Borteck's conduct alone. So, because Mr. Borteck's direct liability provides the sole basis for GPG's vicarious liability, it cannot also support his own liability for aiding and abetting GPG. *See McSweeney* v. *Cohen*, 776 F. Supp. 3d 200, 260 (S.D.N.Y. 2025) ("Significantly, however, an individual cannot aid and abet his or her own violation of the statute." (internal quotation marks and citations omitted)); *Singhal* v. *Doughnut Plant, Inc.*, No. 20 Civ. 3295 (ALC), 2022 WL 976885, at *5 (S.D.N.Y. Mar. 31, 2022) ("Under the NYSHRL and NYCHRL, [an] individual[ ] may not be held liable merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating that law." (alterations adopted) (internal quotation marks and citation omitted)); *Baptiste* v. *City Univ. of N.Y.*, 680 F. Supp. 3d 415, 427 (S.D.N.Y. 2023) ("But 'an individual cannot aid and abet his or her own violation' of the statute." (quoting *Hardwick* v. *Auriemma*, 983 N.Y.S.2d 509, 512-13 (1st Dep't 2014))); *Krause* v. *Lancer & Loader Grp., LLC*, 965 N.Y.S.2d 312 (Sup. Ct. N.Y. Cnty. 2013) ("[C]ourts have held that an individual cannot aid and abet his own alleged discriminatory conduct." (first citing *Matter of Medical Express Ambulance Corp.* v. *Kirkland*, 913 N.Y.S.2d 296 (2d

Dep't 2010); then citing *Strauss* v. *N.Y. State Dept. of Educ.*, 805 N.Y.S.2d 704 (3d Dep't 2005)); *see also Eckhart* v. *Fox News Network, LLC*, No. 20 Civ. 5593 (RA), 2021 WL 4124616, at *17 (S.D.N.Y. Sept. 9, 2021) (collecting cases for the proposition that "[a]lthough the Second Circuit has found individual defendants liable under § 296(6) even where their own conduct created the hostile work environment that they were alleged to have aided and abetted, … several courts since [that decision], including New York appellate courts, have held that [a]n individual may not be held liable … merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating the NY[S]HRL" and adopting this approach (internal quotation marks and citations omitted)). Therefore, the Court grants summary judgment to Defendants on Count X.

### B. The Court Grants in Part Defendants' Motion for Attorneys' Fees

Having disposed of Defendants' motion for summary judgment, the Court turns now to Defendants' motion for attorneys' fees. To review, the Court sanctioned Plaintiff for failing to comply with her discovery obligations and consequently awarded Defendants then-undetermined fees and costs. (Post-Fact Tr. 20-23). Because the Court has already imposed sanctions, all that is left is for the Court to determine the amount of money Plaintiff owes Defendants — a determination the Court very much hoped to avoid by encouraging the parties to reach an agreement without the Court's intervention. (*Id.* at 22-23; *see also* Def. Fees Br. 15 & n.5 (describing Defendants' "good faith effort to reach resolution of the fee issue" by proposing

$16,848.15 in fees); Pl. Fees Br. 1 (lamenting Defendant's rejection of Plaintiff's $3,500 counteroffer)).

In order to contextualize Plaintiff's precise fees obligation, the Court will first recap the discovery violations that led to this point. Broadly, Plaintiff's violations stem from her failure to abide by the parties' stipulated ESI Protocol, which set forth a procedure for the parties to conduct searches and make productions of certain ESI in their possession. (*See* ESI Protocol). Plaintiff's problems began on September 9, 2024, when she produced as a response to Defendants' first set of interrogatories and requests for production a single 89-page PDF document. (Rauls Fees Aff. ¶ 3; *id.*, Ex. B at 2-3). This PDF was a copy of a file that Plaintiff maintained in hard copy and that included multiple duplicative documents. (*Id.*, Ex. B at 2-3). Plaintiff advised Defendants that she possessed no further responsive documents covering communications about her employment with GPG and working relationship with Mr. Borteck. (*Id.*, Ex. B at 3; Def. Fees Br. 2). Still, Defendants provided Plaintiff with agreed-upon ESI search terms on October 31, 2024, and — after a period of non-responsiveness that forced Defendants to follow up on their request — Plaintiff produced a search term hit report summarizing a search that she ran across multiple personal email accounts and her phone that generated only one additional responsive, non-duplicative document. (Rauls Fees Aff., Ex. B at 3). Plaintiff also produced that single additional document, which, in addition to 89-page PDF, constituted the entirety of her ESI production prior to

her first deposition on January 22, 2025. (*Id.*, Ex. B at 3; Post-Fact Tr. 9; Def. Fees Br. 2-3).

Plaintiff's first deposition confirmed what Defendants had long suspected: Plaintiff had in her possession multiple unproduced documents responsive to Defendants' requests. (Rauls Fees Aff., Ex. B at 3; *see also* Def. Fees Br. 3). Further, Plaintiff's testimony made clear that she had conducted the search and review process herself, with minimal oversight from her counsel. (Rauls Fees Aff., Ex. B at 3; *see also* Def. Fees Br. 3). These revelations led Defendants to file a letter with the Court the following day requesting that the Court compel Plaintiff to provide the yet-unproduced documents in her possession and that it compel her counsel to conduct a relevance review of those documents. (Rauls Fees Aff., Ex. B). Plaintiff filed a response letter alerting the Court that she and her counsel consented to Defendant's requests (*id.*, Ex. C), so the Court issued an Order on February 3, 2025, setting a February 12, 2025 deadline for her compliance (*id.*, Ex. D).

Despite the Court's Order, Plaintiff's February 12, 2025 production was incomplete, leading Defendants to engage in substantial efforts to obtain a full production. (Rauls Fees Aff. ¶ 7 (describing "multiple communications with counsel," "deficiency letters," and "meet and confers")). Those exchanges were unsuccessful, so on April 17, 2025, Defendants submitted a second letter to the Court detailing their difficulties in securing Plaintiff's compliance with the Court's Order and with her discovery obligations more broadly. (*Id.*, Ex. E). Defendants asked the Court to compel Plaintiff to produce a hit report of her

document search, and they sought permission to continue Plaintiff's deposition in order to question her about those documents. (*Id.*, Ex. E at 3). Plaintiff filed a response letter denying Defendants' accusations and asserting that she "has gone above and beyond to ensure that her productions are complete and responsive." (*Id.*, Ex. F at 2). But, as evidenced by a later production and hit report discussed below, Plaintiff's assertions were demonstrably false. (*See id.* ¶ 15 ("On June 30, 2025, Plaintiff provided a hit report for electronic searches and on July 2 and 3 produced 795 pages of additional documents[.]")). After reviewing the parties dueling letters, on April 24, 2025, the Court issued an Order granting Defendants' request to compel Plaintiff to produce the hit report and denying their request to continue her deposition without prejudice to its renewal. (*Id.*, Ex. G). The Court also noted that "Defendants may seek leave to file [a] motion regarding Plaintiff's spoliation of evidence." (*Id.*, Ex. G at 3).

Plaintiff flouted the Court's April 24, 2025 Order too. On May 7, 2025, Plaintiff re-produced a near-identical search term hit report and failed to provide a meaningful explanation of how she conducted the searches and how they differed from her prior searches. (Rauls Fees Aff., Ex. H at 1). As a result, on June 5, 2025, Defendants filed a third letter with the Court seeking leave to move for sanctions in light of Plaintiff's spoliation of evidence. (*Id.*, Ex. H). The Court permitted Plaintiff an extension of time to respond to this letter and "[i]n the meantime" ordered the parties to meet and confer regarding the issues raised in that letter. (*Id.*, Ex. I at 2). The parties did so and reached an agreement that led Defendants to withdraw their letter. (*Id.*, Ex. J). In

exchange for Defendants' withdrawal, Plaintiff's counsel agreed to "personally conduct ESI searches" of Plaintiff's email accounts, text messages, and iMessages and to produce the results. (*Id.*). Defendants also reserved their right to renew their request for a continuation of Plaintiff's deposition. (*Id.*; *see also id.*, Ex. K (Court denying as moot Defendants' request to move for sanctions and ordering parties to comply with their agreed-upon procedures)). Eventually, between June 30 and July 3, 2025, Plaintiff produced an electronic search hit report and 795 pages of additional documents. (*Id.* ¶ 15). In response, Defendants sought to depose Plaintiff a second time regarding these new documents. (Def. Fees Br. 12-13 (citing Rauls Fees Aff., Ex. L-N)). Plaintiff refused (*id.*), so the Court set the matter for discussion at the upcoming post-fact discovery pretrial conference (Dkt. #70).

It was at this conference that the Court sanctioned Plaintiff for her numerous discovery violations and awarded two forms of relief. (Post-Fact Tr. 20-23). The first form was to order Plaintiff to sit for a second deposition and to pay for the associated costs. (*Id.* at 21). Plaintiff has satisfied this obligation: she sat for the second deposition and paid the associated costs. (Def. Fees Br. 1 n.1). Defendants therefore only seek fees related to the second form of relief, the costs they incurred in "prying" the missing documents "out of the plaintiff's hands," including by repeatedly resorting to Court intervention. (Post-Fact Tr. 21).

### 1. Applicable Law

Because the Court has already sanctioned Plaintiff (Post-Fact Tr. 20-21), it now need only determine the reasonable attorneys' fees to which Defendants are entitled. Before proceeding to this calculation, however, the Court quickly reviews the authority from which it derived its power to sanction Plaintiff.

#### a. Sanctions Determinations Under Federal Rule of Civil Procedure 37

The Second Circuit has confirmed that "a district court 'has wide discretion to impose sanctions for abusing' the discovery process." *Bilodeau* v. *Usinage Berthold, Inc.*, No. 24-299-cv, 2025 WL 1778857, at *3 (2d Cir. June 27, 2025) (summary order) (quoting *Kyros Law P.C.* v. *World Wrestling Ent., Inc.*, 78 F.4th 532, 545 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 822 (2024)). Federal Rule of Civil Procedure 37 allows a court to impose discovery sanctions in multiple contexts, two of which are relevant here.

*First*, Rule 37(a) applies when a party files a motion to compel. The Rule provides that if such a "motion is granted — or if the disclosure or requested discovery is provided after the motion was filed — the court *must* … require the party … whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion." Fed. R. Civ. P. 37(a)(5)(A) (emphasis added). But the Court "must not" impose such sanctions if "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was

substantially justified; or (iii) other circumstances make an award of expenses unjust." *Id.*

*Second*, Rule 37(b) concerns a party's failure to comply with a court order, and it provides that when "a party … fails to obey an order to provide or permit discovery … the court … may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). Indeed, "the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

Several considerations inform a court's analysis of a motion for sanctions under Rule 37, including: "[i] the willfulness of the non-compliant party or the reason for noncompliance; [ii] the efficacy of lesser sanctions; [iii] the duration of the period of noncompliance[;] and [iv] whether the noncompliant party had been warned of the consequences of noncompliance." *Agiwal* v. *Mid Island Mortg. Corp.*, 555 F.3d 298, 302-03 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Nieves* v. *City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)); *accord Doe* v. *Delta Airlines Inc.*, 672 F. App'x 48, 50 (2d Cir. 2016) (summary order) (discussing the *Agiwal* factors). Courts are also guided by the principle that they should impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 673 F. Supp. 3d 345, 354 (S.D.N.Y. 2023); *Grammar* v. *Sharinn & Lipshie, P.C.*, No. 14 Civ. 6774 (JCF),

2016 WL 525478, at *3 (S.D.N.Y. Feb. 8, 2016). "[T]he range of sanctions, from the least harsh to the harshest, include further discovery, cost-shifting, fines, special jury instructions, preclusion, entry of default judgment, and dismissal." *Slovin* v. *Target Corp.*, No. 12 Civ. 863 (HB), 2013 WL 840865, at *6 (S.D.N.Y. Mar. 7, 2013). The Second Circuit has thus characterized the imposition of reasonable expenses and attorneys' fees as "[t]he mildest" of the sanctions that Rule 37 authorizes. *Cine Forty-Second St. Theatre Corp.* v. *Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979); *accord Ritchie Risk-Linked Strategies Trading (Ir.), Ltd.* v. *Coventry First LLC*, 280 F.R.D. 147, 157 (S.D.N.Y. 2012).

This Court drew its authority to impose sanctions on Plaintiff from Rule 37 (*see* Post-Fact Tr. 22 ("I have the power under the Federal Rules of Civil Procedure to impose sanctions in instances of this type")) and imposed "a very, very mild sanction, which is just some portion of the costs that have been incurred by the defense in getting [the responsive documents from Plaintiff]" (*id.* at 22; *see also* Def. Fees Reply 6 (explaining correctly that "[t]he Court's 'very, very mild sanction' language" did not refer "to the damages it would award Defendants, but rather [to] the comparatively harsher sanctions it could have imposed on Plaintiff")).

**b. The Lodestar Method of Awarding Attorneys' Fees**

Having confirmed its authority to sanction Plaintiff by requiring it to pay some of Defendants' attorneys' fees, the Court now proceeds to determining the amount of fees Plaintiff must pay.

Attorneys' fees are typically awarded by determining the "presumptively reasonable fee," often (if imprecisely) referred to as the "lodestar." *Millea* v. *Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008)); *see also Perdue* v. *Kenny A. ex rel. Winn*, 559 U.S. 542, 552-53 (2010); *Rossbach* v. *Montefiore Med. Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 4940306, at *1 (S.D.N.Y. Oct. 22, 2021) ("When a court imposes a monetary sanction against a party in the amount of its adversary's attorneys' fees, the familiar lodestar method is used to calculate the appropriate sum."), *aff'd in part and vacated in part on other grounds*, 81 F.4th 124 (2d Cir. 2023). The lodestar is calculated by multiplying the "reasonable hourly rate and the reasonable number of hours required by the case." *Millea*, 658 F.3d at 166.

Courts may, only after the initial calculation of the presumptively reasonable fee, adjust the total when it "does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Lilly* v. *City of New York*, 934 F.3d 222, 230 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Millea*, 658 F.3d at 167).[9] A district court possesses

---

9 The Second Circuit confirmed in *Lilly* v. *City of New York*, 934 F.3d 222 (2d Cir. 2019), that while this Circuit has adopted the lodestar approach for fee determinations, the 12 factors set forth in *Johnson* v. *Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by*, *Blanchard* v. *Bergeron*, 489 U.S. 87 (1989) — which articulated a competing method for fee determinations — "remain important tools for helping district courts calculate the lodestar and, in exceptional cases, determining whether an enhancement or cut to the lodestar is warranted." *Lilly*, 934 F.3d at 233. These 12 factors are: (i) the time and labor required; (ii) the novelty and difficulty of the questions; (iii) the level of skill required to perform the legal service properly; (iv) the preclusion of employment by the attorney due to acceptance of the case; (v) the

considerable discretion in awarding attorneys' fees. *See Millea*, 658 F.3d at 166; *Arbor Hill*, 522 F.3d at 190.

"To determine the reasonable hourly rate for each attorney, courts must look to the market rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Heng Chan* v. *Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 WL 1373118, at *2 (S.D.N.Y. May 8, 2007) (quoting *Gierlinger* v. *Gleason*, 160 F.3d 858, 882 (2d Cir. 1998)). The Second Circuit's "forum rule" requires courts to "generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." *Simmons* v. *N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Arbor Hill,* 493 F.3d at 119). At bottom, "[t]he presumptively reasonable fee boils down to 'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'" *Id.* (quoting *Arbor Hill,* 493 F.3d at 112, 118).

"A district court has discretion to determine a reasonable hourly rate based on considerations such as the complexity of the case, the prevailing rates in similar cases in the district, and the quality of representation." *Pasini* v. *Godiva Chocolatier, Inc.*, 764 F. App'x 94, 95 (2d Cir. 2019) (summary order)

---

attorney's customary hourly rate; (vi) whether the fee is fixed or contingent; (vii) the time limitations imposed by the client or the circumstances; (viii) the amount involved in the case and results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *County of Albany*, 522 F.3d 182, 186 n.3 (2d Cir. 2008) (citing *Johnson*, 488 F.2d at 717-19).

(citing *Townsend* v. *Benjamin Enters., Inc.*, 679 F.3d 41, 59 (2d Cir. 2012)); *accord Lilly*, 934 F.3d at 231-32. In this setting, "the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Bliven* v. *Hunt*, 579 F.3d 204, 213 (2d Cir. 2009) (internal quotation marks omitted) (quoting *DiFilippo* v. *Morizio*, 759 F.2d 231, 236 (2d Cir. 1985)).

When determining the reasonable number of hours, a court must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." *Haley* v. *Pataki*, 106 F.3d 478, 484 (2d Cir. 1997) (internal quotation marks omitted) (quoting *Lunday* v. *City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) (per curiam)). In addition, the court should examine the hours expended by counsel with a view to the value of the work product to the client's case. *See Lunday*, 42 F.3d at 133-34. The court is to exclude "excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." *Quaratino* v. *Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).

In determining whether hours are excessive, "the critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Samms* v. *Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) (quoting *Grant* v. *Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)). Where "the billing records are voluminous, it is less important that

judges attain exactitude, than that they use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent." *Yea Kim* v. *167 Nail Plaza, Inc.*, No. 05 Civ. 8560 (GBD) (GWG), 2009 WL 77876, at *4 (S.D.N.Y. Jan. 12, 2009) (internal quotation marks omitted) (quoting *Alveranga* v. *Winston*, No. 04 Civ. 4356 (ARR) (CLP), 2007 WL 595069, at *5 (E.D.N.Y. Feb. 22, 2007)); *see also Fox* v. *Vice*, 563 U.S. 826, 838 (2011) (observing that "[t]he essential goal in shifting fees ... is to do rough justice, not to achieve auditing perfection"). A court retains the discretion to make across-the-board percentage reductions to exclude unreasonable hours, colloquially referred to as "trimming fat." *E.g.*, *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987); *accord McDonald ex rel. Prendergast* v. *Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006).

The burden is on the fee applicant — here, Defendants — to "document[ ] the appropriate hours expended and hourly rates." *Dancy* v. *McGinley*, 141 F. Supp. 3d 231, 235 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Hensley* v. *Eckerhart*, 461 U.S. 424, 437 (1983)). Requested fees "must be supported with contemporaneous time records establishing for each attorney for whom fees are sought, the date on which work was performed, the hours expended, and the nature of the work done." *Abdell* v. *City of New York*, No. 05 Civ. 8453 (RJS), 2015 WL 898974, at *2 (S.D.N.Y. Mar. 2, 2015) (internal quotation marks omitted) (quoting *Sprint Commc'ns Co. L.P.* v. *Chang*, No. 13 Civ. 3846 (RA), 2014 WL 6611484, at *6 (S.D.N.Y. Nov. 21, 2014)).

"[C]ounsel … [are] not required to record in great detail how each minute of [their] time was expended," but "counsel should identify the general subject matter of [their] time expenditures." *Hensley*, 461 U.S. at 437 n.12.

**2. Analysis**

Here, Defendants seek a total of $43,044.25 for 67.2 hours of attorney time billed. (Def. Fees Br. 15 (citing Rauls Aff., Ex. O); *id.* at 15-16; Def. Fees Reply 6 n.2; Rauls Supp. Aff., Ex. A). As explained below, the Court will impose on this number a 15% across-the-board, fat-trimming reduction and award Defendants $36,587.61 in attorneys' fees.

Defendants' requested fees reflect the work performed by three attorneys at Saul Ewing LLP: (i) partner Ruth Rauls, billing at a rate of $715 per hour, (ii) associate Mark Nehme, billing at a rate of $485 per hour, and (iii) associate Katherine Chrisman, billing at a rate of $440 per hour. (Def. Fees Br. 15). Breaking down that top-line number, Defendants first incurred $29,031.75 in fees for 42 hours spent navigating Plaintiff's failure to produce the ESI-related documents, including negotiations with Plaintiff's counsel and the preparation and submission of the various letters filed with the Court. (*Id.*; Rauls Aff., Ex. O). Defendants then incurred an additional $14,012.50 for 25.2 hours spent preparing the fee petition presently before the Court. (Def. Fees Reply 6 n.2; Rauls Supp. Aff., Ex. A).

Employing the lodestar method, the Court finds that these rates and hours are reasonable. Defense counsel's rates are reasonable in light of their positions, experience, and the prevailing rates in this District. Ms. Rauls has

20 years of litigation experience and currently serves in various leadership roles at Saul Ewing, including as the Chair of the Labor and Employment Practice, as a Vice Chair of the Litigation Department, and as a member of the firm's Executive Committee. (Rauls Fees Aff. ¶¶ 26-27). Mr. Nehme has been practicing law for eight years and has focused exclusively on employment law since 2020. (*Id.* ¶ 28). And Ms. Chrisman began her legal career in 2020 with two years of clerking in the New Jersey courts (where she was exposed to employment litigation) and has practiced employment litigation at Saul Ewing since 2023. (*Id.* ¶ 32). Prevailing rates in this District demonstrate that such counsel's respective hourly rates of $715, $485, and $440 are reasonable. *See, e.g.*, *Carrington* v. *Graden*, No. 18 Civ. 4609 (KPF), 2020 WL 5758916, at *11-15 (S.D.N.Y. Sept. 28, 2020) (finding reasonable hourly rates of up to $900 for partners and up to $425 for associates) (collecting cases); *Regulatory Fundamentals Grp. LLC* v. *Governance Risk Mgmt. Compliance, LLC*, 2014 WL 4792082, at *2-3 (S.D.N.Y. Sept. 24, 2014) (collecting cases for the propositions that "district courts have approved rates for experienced law firm partners in the range of $500 to $800 per hour" and "rates for law firm associates in the range of $200 to $450 per hour"); *Union of Orthodox Jewish Congregations of Am.* v. *Royal Food Distribs. Liab. Co.*, 665 F. Supp. 2d 434, 437 (S.D.N.Y. 2009) (approving as reasonable rates of $735 per hour for a partner and $445 per hour for an associate); *Magalios* v. *Peralta*, 2024 WL 1856303, at *3, 5 (S.D.N.Y. Apr. 26, 2024) (deeming $650 per hour reasonable for experienced civil rights litigators and noting that "hourly rates continue to increase over

time and more current rates should be used in setting reasonable hourly rates" (internal quotation marks and citation omitted)); *Malletier* v. *Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347, 360 (S.D.N.Y. 2010) (approving, nearly 17 years ago, rates somewhat similar to those here).

Likewise, defense counsel's hours are reasonable. Defendants seek fees for 67.2 hours worked — 42 dedicated to resolving Plaintiff's derelictions of her discovery duties and 25.2 spent preparing the instant fee petition. (Rauls Aff., Ex. O; Rauls Supp. Aff., Ex. A). *See also Reed* v. *A.W. Lawrence & Co.*, 95 F.3d 1170, 1183-84 (2d Cir. 1996) (holding that time spent working on a fee application is compensable). Plaintiff argues that these hours are "excessive, redundant, and vague." (Pl. Fees Opp. 7). And she asserts, without citation to authority, that Defendants cannot recover fees for their work performed on the June 5, 2025 letter because it was "resolved by stipulation." (*Id.* at 6-7). Taking the contentions in reverse order, the Court finds Plaintiff's stipulation argument to be unavailing; reaching eventual resolution on an issue does not erase the work done in service of that resolution, and, in this case, the parties likely would never have reached such resolution if Defendants had not sought Court intervention. Additionally, Plaintiff argues that defense counsel needlessly duplicated work when, for example, Ms. Rauls billed 0.4 hours to "[r]eview and revise deficiency letter and communicate with M. Nehme," and Mr. Nehme simultaneously billed 0.7 hours to "[r]evise deficiency letter … and conference with R. Rauls." (*Id.* at 7). Although this argument does little to persuade the Court — particularly because it is normal, and indeed in many

circumstances required by Federal Rule of Civil Procedure 11, for a supervising lawyer to review her junior's work — the Court recognizes that defense counsel perhaps could have done more to reduce redundancy. That is one reason why the Court will impose a 15% across-the-board reduction in Defendants' fee award.

Another reason is Plaintiff's arguments about her inability to pay. (*See* Pl. Fees Br. 4-5). Although the Court is not moved by Plaintiff's argument that it is "unjust" under Rule 37 to require a party to pay fees it cannot immediately afford (*see id.* at 4 (citing *Star Mark Mgmt., Inc.* v. *Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 179 (2d Cir. 2012))), it remains true that imposing on an individual plaintiff a fees penalty that is three times her annual income (*see id.* at 5 (estimating Plaintiff's annual income at $14,525 (citing Kulick Decl. ¶ 9))) may not serve "the underlying purpose of sanctions — to punish deviations from proper standards of conduct with a view toward encouraging future compliance and deterring further violations," *Star Mark Mgmt., Inc.*, 682 F.3d at 179 (internal quotation marks and citation omitted). Accordingly, the Court determines that a 15% across-the-board reduction on the fees Plaintiff must pay Defendants "serves to trim the fat." *Chakma* v. *Sushi Katsuei, Inc.*, No. 23 Civ. 7804 (KPF), 2026 WL 1399056, at *14 (S.D.N.Y. May 19, 2026) (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d at 237); s*ee also, e.g.*, *Regulatory Fundamentals Grp. LLC*, 2014 WL 4792082, at *2 n.2 (approving fees award with 15% discount); *Malletier*, 687 F. Supp. 2d at 363-64 (imposing 15% reduction (citing, among others, *In re Agent Orange Prod. Liab.*

*Litig.*, 818 F.2d at 237)). The Court determines that Plaintiff must pay Defendants $36,587.61 in attorneys' fees.

**CONCLUSION**

The Court cautions Plaintiff that success in defending against a summary judgment motion, particularly where the underlying claims are brought pursuant to the NYSHRL and the NYCHRL, is no guarantee of success at trial. Indeed, in many respects, Defendants' interpretation of the record evidence is far more compelling. However, at this stage the Court is limited to determining whether Defendants' arguments succeed as a matter of law, and for all of the reasons outlined above, many do not. Accordingly, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The following claims shall proceed to trial:

- Count II, against GPG (Title VII hostile work environment)
- Count III, against GPG (Title VII retaliation)
- Count VI, against GPG and Mr. Borteck (NYSHRL retaliation)
- Count VII, against GPG and Mr. Borteck (NYCHRL gender discrimination)
- Count VIII, against GPG and Mr. Borteck (NYCHRL hostile work environment)
- Count IX, against GPG and Mr. Borteck (NYCHRL retaliation)

Defendants' motion for attorneys' fees is also GRANTED IN PART, in that the Court AWARDS Defendants $36,587.61 in attorneys' fees. Such payment must be made by Plaintiff within 30 days of this Opinion, unless the parties

agree to a different schedule. The parties are further ORDERED to submit a joint letter proposing next steps in this case on or before **September 11, 2026**.

The Clerk of Court is directed to terminate the pending motions at docket entries 80 and 85.

SO ORDERED.

Dated: August 21, 2026
New York, New York

KATHERINE POLK FAILLA
United States District Judge